**Norman HUTTON, Plaintiff–Appellant,**

v.

**ELF ATOCHEM NORTH AMERICA, INC., a Pennsylvania corporation, Defendant–Appellee.**

**No. 00–35683.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 10, 2001

Filed Nov. 28, 2001

---

Meagan A. Flynn, Preston Bunnell & Stone, LLP, Portland, Oregon, for the plaintiff-appellant.

Richard C. Hunt, Barran Liebman, LLP, Portland, Oregon, for the defendant-appellee.

Before: THOMPSON, TASHIMA, and GRABER, Circuit Judges.

TASHIMA, Circuit Judge:

Plaintiff–Appellant Norman Hutton ("Hutton") sued his former employer, Defendant–Appellee Elf Atochem North America, Inc. ("Elf"), for disability discrimination under Title I of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101–12117 (1995), and Oregon's disability discrimination law, Or.Rev. Stat. §§ 659.405, 659.436 (1999), in state court. The case was removed to federal district court on the basis of diversity jurisdiction, where the parties consented to having the case heard by a magistrate judge under 28 U.S.C. § 636(c)(1). The district court granted Elf's motion for summary judgment, concluding that Hutton had not established that he was a qualified individual under the relevant statutes. Hutton timely filed this appeal, arguing that the existence of genuine issues of material fact regarding his ability to perform the essential functions of his job precluded summary judgment. We have jurisdiction under 28 U.S.C. §§ 636(c)(3) & 1291, and we affirm.

## I. Factual Background

Elf operates a 55–acre facility in Portland, Oregon, where it manufactures chlorine and related chemical products. The plant operates on a 24–hour–per–day basis. Hutton began working for Elf in 1986 and, in 1989, became a chlorine finishing operator, a position that he held until 1998. Elf hired Hutton with the knowledge that he had been diagnosed as a Type I diabetic.

As a chlorine finishing operator, Hutton worked a rotating shift, which meant that he was required to work seven consecutive graveyard shifts, seven consecutive swing shifts, and six consecutive day shifts, with time off between each rotation. In his position, Hutton was responsible for operating the equipment that produced, stored, and transferred liquid chlorine. The chlorine was initially pumped into the chlorine finishing department in gas form, and it was Hutton's job to operate the refrigeration unit that chilled the gas, transforming it into liquid chlorine. Once the chlorine was liquified, Hutton was responsible for transferring it into storage tanks and monitoring their capacity through a variety of gauges and instruments. As chlorine accumulated in the storage tanks, Hutton was required to transfer the liquid chlorine to waiting rail cars. To do this, it was necessary for Hutton to set the brakes on the rail cars, weigh the cars, connect hoses from the storage tank units to the rail cars, perform safety checks, open the appropriate valves, and pump the chlorine. Once the cars were filled, Hutton had to shut off the pump, close the valves, and empty the lines between the storage tanks and rail cars. There was an alarm that sounded when a rail car was almost full.

During his tenure at Elf, Hutton experienced a number of diabetic episodes. On May 17, 1989, Hutton went into insulin shock while he was pumping chlorine from the storage tanks, causing him to have difficulty communicating with his co-workers. An ambulance was called and Hutton was treated with intravenous glucose. On July 26, 1989, Hutton experienced another diabetic episode while loading a barge. After this incident, the foreman of the finishing department spoke with Hutton and asked him to commit to taking better care of himself and eating properly. Hutton again experienced a diabetic episode on August 15, 1989, as he was hurrying to fill rail cars with chlorine. On this occa-

sion, too, an ambulance was called and Hutton was given oral glucose.

On February 9, 1992, as Hutton was talking with his replacement at the end of his shift, he had a seizure and lost consciousness. An ambulance was called and, this time, Hutton was taken to the hospital. After examining Hutton, Dr. Richard Bills advised him to check his blood sugar before each meal and approximately two hours after receiving insulin, and to keep a record of his insulin injections and chem strip measurements.

Following this incident, in a letter dated February 25, 1992, Elf's management notified Hutton that he would be required to meet specified conditions in order to continue his employment. In particular, the letter required that Hutton remain under the supervision of Dr. Bills; provide evidence of a medical examination and laboratory blood assessment to Elf on a periodic basis; maintain a daily log related to diet, insulin intake, and certain other activities; monitor blood sugar levels and regulate insulin intake in accordance with Dr. Bills' recommendations; and submit to company requests for chem strip blood sugar tests. Hutton signed the letter, which concluded by stating that the "[f]ailure to abide by any of the above conditions, or another incident of insulin reaction or diabetic loss of function," would leave Elf with no alternative but to terminate Hutton's employment immediately. Although Hutton subsequently maintained the required daily logs, he did not always do so consistently and was not asked to produce the information.

In accordance with the company's policy of medically certifying employees, like Hutton, who were provided with respirators to protect them from chlorine gas, Elf retained Legacy Occupational Medical Clinic to conduct annual physical examinations. Under this program, Dr. John Reichle, an occupational physician, performed medical examinations of Hutton from 1993 to 1998. Each of these examinations indicated that Hutton had elevated glucose levels. During the period from 1992 to 1996, Hutton experienced at least two additional diabetic episodes, outside work, during which he lost consciousness.

On February 10, 1998, Hutton was examined by Dr. Merrill Ahrens, his primary care physician. Dr. Ahrens' notes stated that it "sounds like [Hutton] practices very loose control" and that his "[r]otating shift is a major complicating factor." Dr. Reichle's annual examination on May 26, 1998, indicated that Hutton had elevated glucose levels and high blood pressure. Since Hutton had refused to submit to a blood test, Dr. Reichle requested that Hutton obtain one from his primary physician and deferred his determination of Hutton's fitness for his position pending receipt of the blood work analysis.

In a letter to Hutton dated June 24, 1998, Larry Hellie ("Hellie"), Elf's Regional Human Resources Manager, indicated that no blood work had yet been done and stated that Hutton's completion of the annual medical examination was a condition of his employment. The letter further reiterated Hutton's commitment to adhere to the written conditions of employment signed in February 1992, and stated that "[i]f the required blood work is not completed, and the results and analysis received by Legacy Occupational Medical Clinic before close of business on Wednesday July 1, 1998, you will be place [sic] on a leave-of-absence pending discharge." In a letter dated July 1, 1998 and addressed "To Whom It May Concern," Dr. Ahrens stated that he last examined Hutton on March 17, 1998, and that "[h]is most recent laboratory test showed a fructosamine of 302 which indicates fairly good control of his diabetes." The letter concluded by

stating that "[Hutton] tells me he needs a letter stating that his diabetes is adequately controlled to continue working and this is true." Despite this letter, Dr. Reichle refused to recommend that Hutton was fit for his position.

On July 2, 1998, Hutton experienced an insulin reaction while working the day shift. Hutton felt the episode coming on and went to get some food to counter the reaction, when an alarm sounded. Hutton returned to his office area, corrected the alarm, and then experienced a several-minute period in which he felt light-headed and could not communicate.

On July 8, 1998, Hutton received a letter from Hellie stating that he was being suspended. The letter stated in relevant part:

> Your medical suspension is based on three separate issues. First, you have not provided medical information regarding blood glucose stability from your personal physician as directed in the June 24, 1998 memorandum. Second, you failed to maintain your blood glucose within appropriate levels which caused an insulin reaction on Thursday, July 2, 1998, when you stated your blood glucose had dropped to 36, borderline for severe hypoglycemia.... Third, you are in violation of the Last Chance Agreement signed on February 25, 1992.

The letter further required that Hutton "provide appropriate and complete medical documentation to Dr. John Reichle ... of [his] blood glucose stability," including "a medical history and narrative report" and a "record of capillary glucose readings." The letter also directed Hutton to submit to a "fitness for duty examination at Legacy Occupational Medical Clinic." It concluded by informing Hutton that failure "to complete the above listed medical conditions before October 6, 1998" would re-

sult in termination "effective October 7, 1998."

Following Hutton's suspension, Jim O'Connor, an attorney working for Hutton's union, wrote a letter to Dr. Ahrens asking him to provide Dr. Reichle documentation regarding Hutton's blood glucose stability. On September 2, 1998, Dr. Ahrens wrote a letter "To Whom It May Concern," in which he opined that, "[g]iven his medical history and current level of control, [Hutton] is at lower than average risk of low blood sugar reactions." Dr. Ahrens recommended that Hutton "simply needs to continue a standard dietary regimen and regular blood sugar monitoring and he can return to work."

Around this time, Hutton was also treated by Dr. Harry Glauber, a diabetic specialist with Kaiser. In a letter dated September 3, 1998, Dr. Glauber stated that Hutton was "free of the usual chronic complications of diabetes" and had "not had frequent need for emergency or hospital treatment for acute complications of severe hypoglycemia or for diabetic ketoacidosis." He noted that Hutton was "attempting intensive diabetes management" and that "his control and glycemic stability are improving." Dr. Glauber concluded:

> I do not consider having Type 1 diabetes mellitus a disability. People with diabetes mellitus do best with a regular and predictable work schedule, that includes scheduled time for meal breaks. If a patient with diabetes follows an appropriate program, with reasonable accommodations for testing and meals at work, then the chance of recurrent severe hypoglycemia can be minimized.

In his summary of Hutton's examination, Dr. Glauber indicated that Hutton's "awareness of hypoglycemia is diminished."

In a letter to Hellie dated September 4, 1998, Dr. Reichle stated that a review of

the medical records provided by Dr. Ahrens raised "several points of concern." In particular, Dr. Reichle indicated that Hutton's diabetes was "relatively unstable" and pointed out that Dr. Ahrens "states that it is entirely unrealistic to expect Mr. Hutton not to continue to have recurrent hypoglycemic events." Dr. Reichle also noted that Hutton was "developing diminishing awareness of his hypoglycemic symptoms" and that the records reflected "areas of poor self-management of his condition." Based on these issues, Dr. Reichle refused to recommend reinstatement of Hutton to his position as chlorine finishing operator, noting that "[a]s an unsupervised operator, he would be at serious risk of death and would be placing the surrounding community at risk of a catastrophic event."

Dr. Reichle spoke with Dr. Ahrens on September 24, 1998. During this conversation, Dr. Reichle "described the need to come to agreement on recommending either an accommodation for Mr. Hutton or agreement on a third-party to help resolve this issue." Dr. Reichle, in a progress note reviewing the content of the conversation, stated that Dr. Ahrens' response was a matter of concern, and that the two were unable to agree on a course of action. On September 26, 1998, Dr. Ahrens wrote a letter to Dr. Reichle in which he indicated that "it seems we are all agreed: that the best situation for [Hutton] (and the best for management of his diabetes) would involve a change in duties such that he work dayshifts only and never alone for prolonged periods." Dr. Ahrens concluded by expressing "hope that this note will help [Hutton] get back to work as soon as possible; this has been his main goal from the start." On September 29, 1998, Dr. Reichle suggested that "[a] reasonable accommodation might consider the elimination of both graveyard and swing shift rotations as well as placing Mr. Hutton in an environment where he is capable of being observed by other employees."

On October 8, 1998, Hutton attended a meeting with company and union representatives to discuss whether it would be appropriate to place Hutton in a number of different positions. At that meeting, the group concluded that, under the collective bargaining agreement, Hutton did not have sufficient seniority to replace any of the day shift workers holding jobs that might be suitable. It was also determined that Elf was not required to accommodate Hutton by creating a special new position. It was further concluded that Hutton could not be placed in a relief operator position, in which he would fill in for operators who were on leave, because that option would still pose unacceptable risks.

Dr. Reichle and Dr. Ahrens decided to have Hutton's condition reviewed by a neutral third-party physician in accordance with the collective bargaining agreement applicable to Hutton's position. Dr. James Prihoda, a diabetes specialist, was selected. Dr. Prihoda was provided with copies of Hutton's medical records and was asked to consider Hutton's ability to either return to his job or to work as a relief operator. Dr. Prihoda examined Hutton on January 29, 1999, and February 5, 1999. On February 5, 1999, in a letter to Hellie, Dr. Prihoda stated that Hutton's control of his diabetes had "improved to fair" and that he had "not shown increased episodes of hypoglycemia." Dr. Prihoda concluded that "[t]here are some things that may improve [Hutton's] control overall and decrease his chance for low blood sugars but it is not possible to say that he will have no further hypoglycemic episodes or no periods of altered mentation. He is though clearly not disabled by his diabetes and should be able to be a productive worker."

In response to this report, Dr. Reichle directed a series of specific questions to Dr. Prihoda regarding Hutton's ability to return to work. Dr. Prihoda subsequently issued his full report on Hutton's examinations, which contained his responses to Dr. Reichle's questions. In his advice to Hutton, Dr. Prihoda stated that he could not "recommend shift work for someone with type 1 diabetes as in general it makes it harder to attain one's best control. This, however, is his decision to seek employment and shift work." In a separate section responding to Dr. Reichle, Dr. Prihoda noted that Hutton's risk for hypoglycemia could be decreased with increased monitoring, although he conceded that there was "no way to guarantee that [Hutton] will not have another hypoglycemic episode or its severity." Dr. Prihoda further stated that, "[a]lthough he is separated from other people at night and has no direct supervision, a co-worker in another area of the plant even if there is only 1 or 2, could be responsible for him indirectly either by walking to his work site or having a system that requires him to call his co-worker at pre-designed intervals." In his letter, Dr. Prihoda also made the following observations:

E. As far as restricting from shift work, I can't make a final determination on this. I can't state he will not have hypoglycemic episodes but with the description of his job and potential for chlorine leaks, the risk of any hypoglycemic episode is small but if the right events were to come together, the result could be catastrophic. I think this ends up being a company decision as to whether with minimizing the risk for hypoglycemia with the above recommendations, they would consider his risk of employment acceptable.

F. His risk for hypoglycemia will increase with prolonged overtime and under the conditions sometimes present during the summer. They can be minimized if his meals and testing continue at a regular basis throughout that time, i.e. if he works through what would be a dinner hour to stay overtime, he still needs the break so that he can eat and test rather than working through this. I think this would be an absolute requirement for his employment that meals are not missed.

Dr. Prihoda concluded by stating that he would not recommend someone with type 1 diabetes "search out" a chlorine finishing operator position and that he could not "guarantee" that Hutton would not have hypoglycemia. He noted, however, that Hutton's risk of hypoglycemia could be reduced with "increased testing."

On the basis of this information, Dr. Reichle issued his "fitness for duty evaluation" to Hellie on February 25, 1999. In this letter, Dr. Reichle stated that he would not recommend that Hutton be required to work overtime or rotating shifts due to the increased risk of hypoglycemia that such a schedule would cause. Dr. Reichle also found that "[i]f Mr. Hutton is engaged in crucial tasks that potentially could result in injury to himself or a catastrophic event, he should be under the observation of someone at all times." In addition, Dr. Reichle suggested that the use of a respirator by Hutton would "significantly increase" his risk of hypoglycemia. He concluded by asserting that "[i]t seems very clear ... that the position of third relief operator is not suitable for Mr. Hutton at this time" and recommended that Hutton be placed in the company storeroom.

Hutton subsequently consulted with Dr. Sabin Belknap, a diabetic specialist who worked with Dr. Prihoda. In a letter sent to Hutton's counsel on January 7, 1999, Dr. Belknap concluded that Hutton "should be given the opportunity to return to his form of work." In the report of Hutton's visit dated March 1, 1999, Dr. Belknap stated:

> Upon re-reading Dr. Prihoda's letter, I am more impressed that he has covered the subject thoroughly.... It is frustrating to me to see [Hutton] denied. I've always resisted + detested the attitude that unless things are 100% safe, its a no go because nothing is 100% safe.... A job trial could be worked out [with] more testing + other suggestions of Dr. Prihoda's being employed.

In a letter dated March 22, 1999, Hellie advised Hutton that Elf had "completed a thorough and comprehensive review of the medical reports" from Dr. Ahrens, Dr. Prihoda, and Dr. Reichle. Hellie stated that the reports were "very consistent" and "were used as our guide" in considering "which available vacant positions [Hutton] might be assigned to as an accommodation." In light of the review, Hellie informed Hutton that "there is no current vacant plant position where your medical restrictions and conditions can be accommodated. However, should such a position become available, we will immediately consider you for it." Since that time, eight positions have become available at Elf in the production department, none of which the company has determined is appropriate for Hutton.

## II. Standard of Review

■ The district court's grant of a motion for summary judgment is reviewed de novo. *Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1087 (9th Cir.), *cert. denied,* —— U.S. ——, 122 S.Ct. 201, —— L.Ed.2d —— (2001). The reviewing court applies the same standard used by the district court under Federal Rule of Civil Procedure 56(c). *Lopez v. Smith,* 203 F.3d 1122, 1131 (9th Cir.2000) (en banc). Therefore, this court must determine, viewing the evidence in the light most favorable to the nonmoving party, whether any genuine issues of material fact exist and whether the district court correctly applied the relevant substantive law. *Cordova v. State Farm Ins. Cos.,* 124 F.3d 1145, 1146 (9th Cir.1997).

## III. Discussion

■ Hutton argues that the district court's ruling on Elf's motion for summary judgment was erroneous in light of the factual disputes regarding whether his termination violated the ADA.[1] The ADA provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability." 42 U.S.C. § 12112(a) (1995). To prevail on an ADA claim of unlawful discharge, the plaintiff must establish a prima facie case by showing that: (1) he is a disabled person within the meaning of the statute; (2) he is a qualified individual with a disability; and (3) he suffered an adverse employment action because of his disability. *Kennedy v. Applause, Inc.,* 90 F.3d 1477, 1481 (9th Cir.1996); *see also Humphrey v. Mem'l Hosps. Ass'n,* 239 F.3d 1128, 1132 (9th Cir.2001), *petition for cert. filed,* 69

---

1. The Oregon disability discrimination statute is modeled after the ADA. *See Wheeler v. Marathon Printing, Inc.,* 157 Or.App. 290, 974 P.2d 207, 213 n. 6 (1998). Accordingly, we interpret Or.Rev.Stat. § 659.436 consistently with the ADA. *See* Or.Rev.Stat. § 659.449 (1999) (stating that § 659.436 "shall be construed to the extent possible in a manner that is consistent with any similar provisions of the federal Americans with Disabilities Act of 1990, as amended").

U.S.L.W. 3792 (U.S. Jun. 13, 2001) (No. 00–1860); *Braunling v. Countrywide Home Loans Inc.*, 220 F.3d 1154, 1156 (9th Cir.2000); *Broussard v. Univ. of Cal., at Berkeley*, 192 F.3d 1252, 1255–56 (9th Cir. 1999).

■■ The ADA defines "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). This definition "includes individuals who could perform the essential functions of a reassignment position, with or without reasonable accommodation, even if they cannot perform the essential functions of the current position." *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1111 (9th Cir.2000) (en banc), *cert. granted in part*, — U.S. ——, 121 S.Ct. 1600, 149 L.Ed.2d 467 (Apr. 16, 2001). The plaintiff bears the burden of proving that he is qualified. *Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104, 1108 (9th Cir.2000).

■ The district court found that Hutton was unable to establish the second prong of the prima facie case because he could not show that he was a "qualified person with a disability" under the ADA.[2] In particular, the district court held that Hutton had not produced evidence to demonstrate that he was able, with or without an accommodation, to perform the essential functions of the chlorine finishing operator position. As part of this analysis, the court determined that Hutton's diabetes created a risk of significant harm to himself and others, thereby disqualifying him from the position.[3] Hutton contends that the existence of factual disputes should have precluded summary judgment on both the essential functions and direct-threat questions. Because we conclude that summary judgment was properly granted based on the existence of a direct threat, we do not reach the issue of whether Hutton could perform the essential functions of the job.

■ The "direct threat" defense to a charge of employment discrimination is set forth in the "Defenses" section of the ADA:

It may be a defense to a charge of discrimination under this chapter that an alleged application of qualification standards, tests, or selection criteria that screen out or tend to screen out or otherwise deny a job or benefit to an individual with a disability has been shown to be job-related and consistent with business necessity, and such performance cannot be accomplished by reasonable accommodation, as required under this subchapter.

42 U.S.C. § 12113(a) (1995). The ADA defines "qualification standards" as including "a requirement that an individual shall not pose a direct threat to the health or

---

2. The district court did not address, and neither party disputes, whether Hutton met the other two requirements of the prima facie test-namely, that he is a disabled person who suffered an adverse employment action because of his disability

3. In finding the existence of a direct threat, the district court indicated that "[t]he record establishes that plaintiff experienced a blackout while pumping chlorine from storage tanks, experienced blackouts following the intense exertion required to load a huge barge and after over exerting while hurrying to load chlorine, and was once found unconscious by his replacement from the following shift." This is a misreading of the record. Hutton experienced a "blackout" on only one occasion, when he lost consciousness at the end of his shift in 1992. The other instances the district court refers to are more accurately described as "diabetic episodes" in which Hutton experienced difficulty communicating and muddled thoughts, but did not black out.

safety of other individuals in the workplace." *Id.* § 12113(b). In regulations interpreting the direct threat provision, the Equal Employment Opportunity Commission ("EEOC") provides the following guidance:

> *Direct Threat* means a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation. The determination that an individual poses a "direct threat" shall be based on an individualized assessment of the individual's present ability to safely perform the essential functions of the job. This assessment shall be based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence. In determining whether an individual would pose a direct threat, the factors to be considered include:
>
> (1) The duration of the risk;
>
> (2) The nature and severity of the potential harm;
>
> (3) The likelihood that the potential harm will occur; and
>
> (4) The imminence of the potential harm.

29 C.F.R. § 1630.2(r) (2000).[4] Because it is an affirmative defense, the employer bears the burden of proving that an employee constitutes a direct threat. *Nunes v. Wal–Mart Stores, Inc.*, 164 F.3d 1243, 1247 (9th Cir.1999).[5]

Here, there is no dispute that Hutton's continuing employment poses some potential harm to others. The parties do disagree, however, as to whether the harm is of sufficient magnitude and likelihood to disqualify Hutton from the chlorine finishing operator position.

Hutton argues that, although a risk of harm exists, it is too remote to warrant disqualification. He cites Dr. Prihoda's assessment that his risk of any hypoglycemic episode is "small" and notes that, during his lengthy tenure at Elf, he lost consciousness only once. Hutton also points to the existence of an elaborate safety system that he claims would mitigate any harm should he experience a debilitating diabetic episode on the job. For instance, he suggests that the potential for harm

---

4. In *Echazabal v. Chevron USA, Inc.*, 226 F.3d 1063 (9th Cir.2000), *petition for cert. granted,* —— U.S. ——, 122 S.Ct. 456, —— L.Ed.2d ——, 70 U.S.L.W. 3314 (2001), we rejected the EEOC's interpretation of the direct threat defense to the extent that it would permit an employer to assert the defense on the basis that an individual poses a safety risk to himself or herself. *Id.* at 1070. To the contrary, we held that "[s]ection 12113 does not afford a defense on the basis that the performance of a job would pose a direct threat to an employee's ... own health or safety." *Id.* Elf also relies on this prong of the direct-threat defense. *Echazabal,* however, forecloses this inquiry.

5. Not all other circuits share our view that the defendant-employer should bear the burden of proof on the direct threat issue. Instead, some courts have placed the burden on the plaintiff to show that she does not pose risks to others as part of demonstrating her qualification for employment. *See EEOC v. Amego, Inc.,* 110 F.3d 135, 144 (1st Cir.1997) (holding that the plaintiff bears the burden of demonstrating "that she can perform ... [essential job] functions in a way that does not endanger others"); *Moses v. Am. Nonwovens, Inc.,* 97 F.3d 446, 447 (11th Cir.1996) (per curiam) ("The employee retains at all times the burden of persuading the jury ... that he was not a direct threat...."). Other courts have also noted this issue, without taking a clear position. *See Emerson v. N. States Power Co.,* 256 F.3d 506, 513 (7th Cir.2001); *Borgialli v. Thunder Basin Coal Co.,* 235 F.3d 1284, 1294–95 (10th Cir.2000); *Donahue v. Consol. Rail Corp.,* 224 F.3d 226, 230–31 (3d Cir.2000); *Rizzo v. Children's World Learning Ctrs., Inc.,* 213 F.3d 209, 212–13 (5th Cir.), *cert. denied,* 531 U.S. 958, 121 S.Ct. 382, 148 L.Ed.2d 294 (2000).

during the refrigeration process is small, because there are cell operators who monitor the flow of the gas and are able to detect and adjust any irregularities in the gas pressure. In addition, he asserts that the size of the storage tanks is such that the finishing operators would have to ignore their responsibilities for three full shifts in order for the tanks to approach maximum capacity. Furthermore, Hutton contends that the structural characteristics of the liquid chlorine transfer equipment— which include a safety device that releases pressure in the event of a buildup, a chlorine sensor and automatic closing system, and a warning alarm—minimize serious risk.

Even were we to agree with Hutton, however, that the likelihood of an accident is small, we conclude that the severity and scale of the potential harm to others presented by Hutton's employment nevertheless pose a significant risk under the direct-threat analysis. *See Donahue v. Consol. Rail Corp.*, 224 F.3d 226, 231 (3d Cir.2000) (stating that "[i]f the threatened harm is grievous ... even a small risk may be 'significant'"). Indeed, the reports of Dr. Reichle and Dr. Prihoda refer to the "catastrophic" nature of the risk of chlorine spillage created by Hutton's diabetes. Hutton himself conceded that, if he were unconscious, chlorine could spill from the rail cars, convert to gas, and cause severe—potentially fatal—harm to other workers and persons near the facility. Moreover, Hutton's treating physicians agreed that the rotating shifts and prolonged hours required by the chlorine finishing operator position made it difficult for him adequately to monitor his diabetes. None of the examining or consulting physicians could rule out the occurrence of a hypoglycemic event that would affect Hutton's ability to remain conscious, alert, and communicative, especially in light of Hutton's somewhat erratic medical history. Further, during swing and graveyard shifts, a chlorine finishing operator is required to work essentially alone.

Our conclusion regarding the existence of a direct threat is supported by *Turco v. Hoechst Celanese Corp.*, 101 F.3d 1090 (5th Cir.1996) (per curiam), which held, on facts similar to those in this case, that a chemical process operator who was diabetic was unqualified for his position under the ADA due to the safety risks he imposed on himself and others. *Id.* at 1094. Specifically, the court in *Turco* found that the plaintiff was a "walking time bomb" since "[a]ny diabetic episode or loss of concentration occurring while operating ... machinery or chemicals had the potential to harm ... others." *Id.* We see no distinction between *Turco* and this case, where it is not disputed that a significant physical or mental lapse by Hutton as a result of a diabetic episode could result in substantial harm to his co-workers and others.[6]

In sum, an individualized assessment of each factor in the EEOC's four-factor test supports the conclusion that Hutton would pose a direct threat: (1) The duration of the risk would exist for as long as Hutton held the chlorine finishing operator's job; (2) The nature and severity of the potential harm is catastrophic—many lives could be lost; (3) Although the likelihood that the potential harm will occur is small, whether and when it will occur cannot be predicted; and (4) The imminence of the potential harm is, as explained, unknown because of

---

6.  As noted in footnote 5, *supra,* the Fifth Circuit has not yet taken a position on who bears the burden of proof on the direct threat issue. This issue apparently was not raised in *Turco,* which contains no discussion of it. The burden-of-proof issue, however, whould not have changed the cited analysis or the result in that case.

the unpredictability of Hutton's condition. *See* 29 C.F.R. § 1630.2(r) (2000). Consequently, we conclude that there is no genuine dispute of material fact regarding whether Hutton's diabetic condition posed a direct threat to the health and safety of other individuals in the workplace.

## IV. Conclusion

For the foregoing reasons, we conclude that the district court properly granted summary judgment to Elf on the ground that Hutton was not a qualified person under the ADA. The judgment of the district court is therefore

**AFFIRMED.**