**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ROBERT DARK,
        *Plaintiff-Appellant,*

    v.

CURRY COUNTY; CURRY COUNTY
ROAD DEPARTMENT; DAN CRUMLEY,
individually and in his official
capacity as Curry County
Roadmaster,
        *Defendants-Appellees.*

No. 04-36087

D.C. No.
CV-03-03041-
JPC/ALA

OPINION

Appeal from the United States District Court
for the District of Oregon
Ann L. Aiken, District Judge, Presiding

Argued and Submitted
December 6, 2005—Portland, Oregon

Filed July 6, 2006

Before: Dorothy W. Nelson, Diarmuid F. O'Scannlain,
Circuit Judges, and Larry A. Burns,* District Judge.

Opinion by Judge O'Scannlain

*The Honorable Larry A. Burns, District Judge for the Southern District
of California, sitting by designation.

## COUNSEL

Manuel C. Hernandez, Hernandez and Associates, LLC, Bandon, Oregon, argued the cause for the appellant and was on the briefs.

Jason M. Montgomery, Law Office of Robert E. Franz, Jr., Springfield, Oregon, argued the cause for the appellee and was on the brief. Robert E. Franz, Jr. was also on the brief.

## OPINION

O'SCANNLAIN, Circuit Judge:

We are asked to review a summary judgment dismissal of a claim by an epileptic heavy-equipment operator for a county road department under the Americans with Disabilities Act.

I

From the age of 16, Robert Dark has suffered from epilepsy. He controls the condition with medication but still endures the occasional seizure which is usually preceded by a physical manifestation called an "aura." An aura is "akin to a nervous jerk"; it indicates "the potential for a seizure on the day of the aura," typically no sooner than one hour later. Dark says that a seizure follows an aura approximately half of the time.

Dark's employment with the Road Department of Curry County, Oregon ("the County") commenced on March 4, 1985. His position, "Maintenance and Construction Worker III," required, among other tasks, the operation of heavy equipment such as construction vehicles. Dark's employment record over approximately 16 years reflects satisfactory, at least, job performance.

On the morning of January 15, 2002, prior to his leaving for work, Dark experienced an aura. Despite this warning, Dark reported for work as scheduled and failed to inform anyone of the possibility of his suffering an epileptic seizure. Later that day, Dark suffered a seizure and fell unconscious while driving a County pickup truck. Fortunately, at the time Dark was operating the vehicle at a very slow rate of speed. His passenger, another Road Department employee, gained control of the vehicle and brought it to a safe halt.

In response to this incident, the County requested that Dark undergo a medical examination. Dr. John Melson, M.D., a neurologist, performed the examination on March 11, 2002 and concluded that "because of the presence of poorly controlled idiopathic epilepsy, [Dark] should not work in high places, he should not work around moving machinery where sudden loss of consciousness would endanger either himself or others, and this would appear to severely limit him from the duties of the job described."

Subsequent to receipt of Dr. Melson's report, the Road Department placed Dark on administrative leave. During this process, Dark's commercial driver's licence was also suspended. On April 1, 2002, the Road Department held a disciplinary hearing at which Dark was represented by counsel. Dark admitted to having experienced an aura on the morning of the incident.

The Road Department terminated Dark's employment on April 17, 2002. It communicated its decision in a three-page letter signed by Daniel P. Crumley, the department's Roadmaster, which concluded that Dark could not perform the essential functions and duties of his position and that his continued employment posed a threat to the safety of others.

Dark appealed these findings to the Curry County Board of Commissioners ("the Board") and received a hearing on May 22, 2002. On June 26, 2002, the Board affirmed Crumley's

decision to terminate Dark's employment. It reasoned that Dark had "acted irresponsibly, recklessly, and with a total disregard of the safety of himself, other employees, and members of the public."

On November 25, 2002, Dark filed a complaint with the Equal Employment Opportunity Commission ("EEOC"). Following an investigation, the EEOC determined that the evidence "does not establish a violation of the Americans with Disabilities Act [("ADA")]." *See* 42 U.S.C. § 12101 *et seq.* On March 11, 2003, it declined to sue the County on Dark's behalf but permitted him 90 days within which to initiate a private action.

Thereafter, on May 5, 2003, Dark filed this lawsuit in the District of Oregon. He sued Curry County, the Road Department, and Crumley under the ADA and Oregon's state-law equivalent. *See* Or. Rev. Stat. § 659A.100 *et seq.*[1] Dark's first claim for relief alleged that the County violated the ADA by discharging him while refusing reasonably to accommodate his disability; his second claim alleged a similar violation of the Oregon statute. Dark seeks recovery of lost wages, future wages, humiliation, and loss of reputation, as well as punitive damages, reinstatement, and attorneys' fees.

The County filed a motion for summary judgment on August 16, 2004. The magistrate judge charged with making a recommendation did not receive a response from Dark because of an alleged postal error. On September 9, 2004, the magistrate judge recommended granting the County's motion. The district court considered the magistrate's recommendation and Dark's subsequently filed Memorandum in Opposition to Defendants' Motion for Summary Judgment and

---

[1]"The standard for establishing a prima facie case of discrimination under Oregon law is identical to that used under federal law." *Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1087 (9th Cir. 2001), *cert. denied*, 534 U.S. 888 (2001).

supporting affidavits. On November 2, 2004, the court adopted the magistrate's recommendation and granted the County's motion for summary judgment and dismissed Dark's lawsuit.

Dark timely appealed.

## II

Dark urges that summary judgment was improperly granted because there are at least three genuine issues of material fact which entitle him to a jury trial, specifically, with respect to (1) the reason given for his termination, (2) his qualifications, and (3) whether he is a "direct threat" to his fellow employees.[2]

---

[2]We review de novo the district court's grant of a motion for summary judgment. *Snead*, 237 F.3d at 1087. We view the evidence in the light most favorable to the nonmoving party and then determine whether there remains a genuine issue of material fact and whether the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *see Nunes v. Wal-Mart Stores, Inc.*, 164 F.3d 1243, 1246 (9th Cir. 1999).

The party moving for summary judgment must only allege that there is an absence of evidence by which the nonmoving party can prove his case. *See Rebel Oil Co., Inc. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1435 (9th Cir. 1995). The nonmoving party may not rest upon the mere allegations or denials in the pleadings. *See* FED. R. CIV. P. 56(e). Still, "[t]he burden on the nonmoving party is not a heavy one; the nonmoving party simply is required to show specific facts, as opposed to general allegations, that present a genuine issue worthy of trial." 10A WRIGHT, MILLER & KANE, FEDERAL PRACTICE AND PROCEDURE, Civil 3d § 2727 (1998).

On a contested factual issue, "[i]f the moving party shows that there is an absence of evidence to support the plaintiff's case, the nonmoving party bears the burden of producing evidence sufficient to sustain a jury verdict on those issues for which it bears the burden at trial." *Atlantic Richfield Co.*, 51 F.3d at 1435 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). Conversely, summary judgment is inappropriate where there are genuine factual issues that may reasonably be resolved in favor of either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

In this case, the County can prevail only if it can show that no reasonable jury would infer from Dark's evidence that he has stated a valid claim under the ADA.

A

Dark first contends that there is a genuine issue of material fact as to whether the County demonstrated a legitimate, non-discriminatory reason for his termination. The County responds that "[t]here is no dispute that the plaintiff did engage in misconduct by driving with knowledge of the risk he posed, and without warning any coworkers of the danger he presented." Thus, the County argues that Dark's termination resulted from misconduct or a failure to meet legitimate job expectations.

1

**[1]** The County alleged in its motion for summary judgement that there are no disputed facts with respect to the reason for Dark's termination. But we find some difficulty with this assertion because the record includes two divergent explanations.

**[2]** The first explanation for Dark's termination is the letter of April 17, 2002, in which Crumley explained his decision in terms of Dark's alleged lack of fitness to perform the duties of the position. In relevant part, the letter stated:

> The allegation that *you cannot perform the essential functions and duties of the job* of Maintenance and Construction Worker III as described is substantiated. . . .
>
> . . . .
>
> Following your on the job seizure on 1/15/02, the County had sufficient concerns *regarding your medical condition* to request an independent Neurologist to evaluate you. . . .
>
> . . . .

> . . . I accept Dr. Melson's findings that *because of the presence of poorly controlled idiopathic epilepsy*, you should not work around moving machinery . . . . That would prevent you from performing the basic work functions outlined in your job description.
>
> . . . .
>
> . . . I believe a "seizure free" condition is critical for workers in your occupation. . . . [*Y*]*our condition in my opinion prevents you from performing your duties* . . . . It is also my conclusion that allowing you to work in your present job for Curry County would impose a threat to the safety and lives of your coworkers and the public.

(Emphases added.) True, the letter also details aspects of the January 15, 2002, incident. But nowhere does Crumley state that Dark's driving the pickup truck despite the aura was an independent reason for the termination.

**[3]** The second explanation, "misconduct," is contained in the Board's order of June 26, 2002. After reciting the relevant facts, the Board reasoned:

> By operating the truck and heavy equipment on January 15, 2002, Mr. Dark knowingly put the safety of himself, co-workers and the general public in jeopardy.
>
> Now, therefore, it is hereby ordered that Dan Crumley's decision to terminate the employment of Robert Dark is hereby affirmed for the reason that on January 15, 2002, Robert Dark acted irresponsibly, recklessly, and with a total disregard of the safety of himself, other employees, and members of the public . . . .

The County, in effect, asserts that the Board's rationale was the only legally relevant reason for Dark's termination.

**[4]** The County, however, provides no explanation as to why we should accept such contention. To the contrary, we think that the role of the Board was simply to entertain the appeal of an already-completed termination. As noted in the Board's order affirming the termination, "[p]ursuant to the Curry County Personnel rules, the Board's mandate was to 'deliberate and reach a decision to affirm, modify or deny the disciplinary action.' " The termination letter also considered Dark's firing to have been a completed act. Regarding Dark's appeal to the Board, the letter stated, "The appeal must be in writing. . . . It must also specify why you believe the dismissal *was* not in good faith, for cause or *was* in error." (Emphases added.) And at oral argument, counsel for the County conceded that the effective date of Dark's termination was April 17, 2002, the date of Crumley's termination letter. Thus, the legally relevant action had already been accomplished before the Board took cognizance of Dark's appeal.

2

**[5]** Of course, even were we to treat the Board's decision as the legally operative one, the reason given for Dark's termination must actually constitute a valid nondiscriminatory explanation, *i.e.*, one that "disclaims any reliance on the employee's disability in having taken the employment action." *Snead*, 237 F.3d at 1093.

**[6]** While courts have indeed "recognized a distinction between termination of employment because of misconduct and termination of employment because of a disability," *Collings v. Longview Fibre Co.*, 63 F.3d 828, 832 (9th Cir. 1995) (citation omitted), there is an important caveat. "[W]ith few exceptions, conduct resulting from a disability is considered to be part of the disability, rather than a separate basis for termination." *Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128,

1139-40 (9th Cir. 2001).**³** The County does not argue that Dark's "misconduct" resulted from other than his disability.**⁴** Thus, the Board's explanation, as a matter of law, fails to qualify as a legitimate, nondiscriminatory explanation for Dark's discharge.

3

Even if the Board's explanation were legitimate and non-discriminatory, we must still must consider it in light of the ADA's standard of causation.

[7] As noted, the County urges us to credit only the rationale provided by the Board of Commissioners, which was that the Road Department terminated Dark because of his "misconduct." But the ADA does not require that a discriminatory impetus have been the *only* motive for an adverse employment action. *See Head v. Glacier Northwest Inc.*, 413 F.3d 1053, 1065 (9th Cir. 2005); *Baird ex rel. Baird v. Rose*, 192 F.3d 462, 469 (4th Cir. 1999); *Foster v. Arthur Andersen,*

---

**³**One of those exceptions is the ADA's explicit authorization for discharge on the basis of alcoholism and illegal drug use, 42 U.S.C. § 12114(c)(4), and the *Humphrey* court, in fact, distinguished *Collings* on that basis. *Id.* at 1139 n.18. Clearly that exception is inapplicable here.

In *Newland v. Dalton*, 81 F.3d 904 (9th Cir. 1996), we suggested that an additional exception might apply in the case of "egregious and criminal conduct" regardless of whether the disability is alcohol- or drug-related. *See id.* at 906 ("Attempting to fire a weapon at individuals is the kind of egregious and criminal conduct which employees are responsible for regardless of any disability."). Again, clearly that exception is inapplicable here.

**⁴**The County does appear to argue that Dark's misconduct, if not resulting from his disability, stemmed from his failure to take proper precautions in light of his disability. But an employer could just as easily say that excessive absenteeism was caused by an employee's failure to arrive at work regardless of his migraine headaches, *see Kimbro v. Atlantic Richfield Co.*, 889 F.2d 869, 875 (9th Cir. 1990), or regardless of his obsessive compulsive disorder, *see Humphrey*, 239 F.3d at 1140. Thus, we think that the case law does not sustain this distinction.

*LLP*, 168 F.3d 1029, 1033-34 (7th Cir. 1999); *McNely v. Ocala Star-Banner Corp.*, 99 F.3d 1068, 1076 (11th Cir. 1996). Rather, "the ADA outlaws adverse employment decisions motivated, *even in part*, by animus based on a plaintiff's disability or request for an accommodation—*a motivating factor standard.*" *Head*, 413 F.3d at 1065 (emphases added).

**[8]** Causation is a factual inquiry, and we are satisfied that there is record evidence sufficient that a jury could reasonably find that Dark was terminated for an impermissible reason. In addition to the April 17, 2002, termination letter, we consider relevant the documentation Dark provided, in an affidavit dated September 6, 2004, of six separate accidents for which other Road Department workers went undisciplined. *See Collings*, 63 F.3d at 834. Such evidence gives rise to a genuine issue of material fact as to whether Dark's disability was a motivating factor for his termination.

4

**[9]** Even if the County had cleared each of the foregoing hurdles, summary judgment is also inappropriate if Dark has shown, by "specific, substantial evidence," that the Board's explanation was mere pretext. *See id.* at 834. Dark must have availed himself of

> "the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision. This burden now merges with the ultimate burden of persuading the court that [he] has been the victim of intentional discrimination. [He] may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."

*Snead*, 237 F.3d at 1093-94 (quoting *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981)).

**[10]** The summary judgment record is replete with evidence suggesting that "misconduct" was a pretext for discrimination on the basis of disability. First, Dark was not immediately terminated after the January 15, 2002, accident, but rather was subjected to a medical examination to determine his fitness for the position. The report generated was entitled, "Fitness to Work Evaluation Report." As Dark aptly stated, the County "did not need a doctor's opinion to assess whether Plaintiff had engaged in misconduct." The record also provides direct evidence of the County's motivation for seeking this examination. The April 17, 2002, termination letter stated, "Following your on the job seizure on 1/15/02, the County had sufficient *concerns regarding your medical condition* to request an independent Neurologist to evaluate you." (Emphasis added.)

**[11]** Second, the documents explaining Dark's termination support an argument for pretext. The letter placing Dark on administrative leave indicates that the County was concerned more with Dark's general condition than the incident of January 15, 2002:

> As you can see, [Dr. Melson] has concluded that you cannot perform the essential functions and duties of your position of Maintenance and Construction Worker III. . . . In addition, allowing you to continue working in your current job for Curry County could impose a direct threat to the safety and lives of your fellow employees and other members of the public.

As already discussed, the termination letter also constitutes substantial evidence suggesting that the "misconduct" rationale is pretext. In addition, the County itself added to the summary judgment record other direct evidence of disability discrimination. In Roadmaster Crumley's affidavit of August 10, 2004, he states:

> A Maintenance and Construction Worker III spends approximately 65% of his time operating and driving heavy equipment. . . .

The potential for harm is significant *if the worker suffers a seizure* while operating heavy machinery on public roads. Not only *could* the plaintiff himself be hurt by an accident, but also his coworkers or the public *could* be injured, even killed, *if the plaintiff had a seizure* while driving a truck or heavy machinery.

(Emphases added.) Crumley's statements are forward-looking; they exhibit a concern with Dark's future ability, given his epileptic condition, to perform safely the essential functions of his job. Given the ADA's standard of causation and a plaintiff's opportunity to show pretext, it is clear that a rationale developed ex post by a reviewing body cannot wipe away the original discriminatory justification for an employee's termination. *See, e.g.*, *Hernandez v. Hughes Missile Systems Co.*, 362 F.3d 564, 569 (9th Cir. 2004) ("From the fact that [the employer] has provided conflicting explanations of its conduct, a jury could reasonably conclude that its most recent explanation was pretextual." (citations omitted)).

**[12]** Third, Dark's showing of pretext is bolstered by comparative evidence. As already noted, the record includes documentation of similar accidents for which other workers went undisciplined. In response, the County lists several prior incidents in which *Dark* was involved but was not disciplined. Its point, we gather, is that Dark was treated no differently than other employees—the County apparently foregoes discipline for most accidents. And yet in the same breath, in its brief the County unwittingly explains how a reasonable jury could conclude that this evidence actually cuts in Dark's favor:

The accidents involving other employees were not seizure-related, and did not give rise to conclusions that the employees were unfit for duty. Similarly, the plaintiff's prior accidents did not result in discipline. It was not until an accident occurred that was caused

by a *seizure*, that the plaintiff's fitness for duty was called into question.

In other words, the County concedes that this accident was special because it involved Dark's disability.

**[13]** For all of the foregoing reasons, we must conclude that the County's evidence of a legitimate, nondiscriminatory motive does not, standing alone, entitle it to summary judgment.

## B

Dark next contends that there is a genuine issue of fact as to whether he was qualified.

**[14]** The ADA defines a "qualified individual" as an individual "with a disability who, *with or without reasonable accommodation*, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8) (emphasis added). Dark bears the burden of proving that he is "qualified." *Hutton v. Elf Atochem North America, Inc.*, 273 F.3d 884, 892 (9th Cir. 2001). We must consider whether Dark can perform the job's essential functions without reasonable accommodation, and then, if he cannot, whether he can do so with reasonable accommodation. *See Kaplan v. City of North Las Vegas*, 323 F.3d 1226, 1231 (9th Cir. 2003).

## 1

The term "essential functions" refers to the "fundamental job duties of the employment position the individual with a disability holds or desires." It does not "include the marginal functions of the position." 29 C.F.R. § 1630.2(n)(1). A job function may be considered "essential" for various reasons. *See id.* § 1630.2(n)(2)(i)—(iii). The statute provides that "consideration shall be given to the employer's judgment as

to what functions of the job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8); *see also* 29 C.F.R. § 1630.2(n)(3) (requiring consideration of the amount of time spent performing the function).

Here, the County, in a September 1995 document entitled "Job Description," lists the "essential duties" of Dark's position as follows:

> Operates grader, dozer, excavator, asphalt distributor, chip spreader, 18-wheel self-loading low boy and ditchmaster.

> Operates dump trucks, front-wheel loaders, brush cutters, rollers, backhoe, water tankers and truck mounted snow plows.

> Performs minor blasting for road maintenance projects. Includes blasting rocks and opening plugged culverts.

> Performs manual labor associated with building fences, cleaning culverts, traffic control, pot hole patching, bridge repair, tree trimming, brush cuffing, etc.

> Maintains equipment by lubricating and making minor repairs.

> Trains employees in lower classifications in the operation of heavy equipment.

The document also states that one of the aspects that "distinguishe[s the position] from lower classifications . . . [is] the emphasis on the operation of heavy equipment." This is valid

evidence of the essential functions of Dark's position with the Road Department.

To prove Dark is unqualified, the County points to the various heavy machines and vehicles that Dark would be required to operate and around which he would be required to work. It contends that an employee in Dark's former position would spend approximately 65% of his time operating such heavy equipment.

Dark does not contest the County's judgment that the operation of heavy machinery is an essential function of the position. Instead, Dark insists that he is indeed qualified to perform such function. He points out that he has suffered only one on-the-job epileptic episode during more than 16 years with the Road Department. Moreover, he says, it was only a change in his medication that caused the January 15, 2002, seizure, and two physicians now recommend that Dark return to work "with minimal or no restrictions." Dark, in sum, rejects Dr. Melson's findings and claims that his seizures are "again under control."

Had Dark's treating physicians opined that Dark was fit to operate heavy machinery at the time of his firing, this perhaps would have given rise to a genuine issue of material fact as to his qualifications *without reasonable accommodation. See, e.g.*, *Fredenburg v. Contra Costa County Dept. of Health Servs.*, 172 F.3d 1176, 1179 (9th Cir. 1999). But the physicians actually recommended Dark's return to work following a period of observation during which he could adjust to the change in his medication. Dark provides no evidence that his seizures were under control at the time of his termination.

2

**[15]** Such dearth of evidence leads to the question of whether Dark was qualified with reasonable accommodation. The ADA's definition of discrimination includes "not making

reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business." 42 U.S.C. § 12112(b)(5)(A); *accord Morton v. United Parcel Serv., Inc.*, 272 F.3d 1249, 1252 (9th Cir. 2001).**⁵**

a

Dark has the burden of showing the existence of a reasonable accommodation that would have enabled him to perform the essential functions of an available job. *See Zukle v. Regents of University of California*, 166 F.3d 1041, 1046 (9th Cir. 1999) (citation omitted). To avoid summary judgment, however, Dark "need only show that an 'accommodation' *seems reasonable on its face*, i.e., ordinarily or in the run of cases." *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 401-02 (2002) (emphasis added).

**[16]** In addition, our cases make clear that the County bore an affirmative obligation to engage in an interactive process in order to identify, if possible, a reasonable accommodation that would permit Dark to retain his employment. *See Allen v. Pacific Bell*, 348 F.3d 1113, 1115 (9th Cir. 2003) (per curiam) (citing *Humphrey*, 239 F.3d at 1137-39); *Morton*, 272 F.3d at 1256 (explaining that summary judgement is available only where there is no genuine dispute that the employer has engaged in the interactive process in good faith); *Nunes*, 164 F.3d at 1248-49 (reversing summary judgment because, *inter alia*, "the record contains no evidence that [the employer] considered any at-work accommodations to reduce the risks it feared" (citation omitted)); *see also* 29 C.F.R. § 1630.2(o)(3) ("To determine the appropriate reasonable accommodation it may be necessary for the covered entity to

---

**⁵**The County does not argue on appeal that any of the accommodations proposed by Dark would have presented an undue hardship to its business.

initiate an informal, interactive process with the qualified individual with a disability in need of the accommodation."). Because the County did not engage in any such process, summary judgment is available only if a reasonable finder of fact *must* conclude that "there would in any event have been no reasonable accommodation available." *Morton*, 272 F.3d at 1256 (citation omitted).

b

Here, the record indicates that Dark requested accommodation through either (1) a temporary change in his duties; (2) reassignment to a new position; or (3) the use of accumulated sick leave or medical leave without pay.

Dark's accommodation proposals are based on his argument that his uncontrolled epilepsy was temporary. Dark argues—with the concurrence of his treating physicians—that he could safely resume all functions of his job upon completing the transition to his new medication. Though Dr. Melson, the County's physician, doubted Dark's overall fitness, he also acknowledged the relevance of Dark's "medication adjustments." At the least, Dark has raised a genuine issue of material fact as to his qualifications post-adjustment. In this light, we consider whether a reasonable juror could find that any of the accommodations proposed by Dark were reasonable and available.

i

**[17]** Regulations under the ADA provide that "job restructuring" may be a "reasonable accommodation" required of the employer. 29 C.F.R. § 1630.2(o)(2)(ii). Dark argues that the transport of heavy machinery consumed only two to three percent of Dark's work time, and thus there is a genuine issue of fact as to whether this was an essential function. For the 40 days during which Dark's commercial driver's license was suspended, he argues, this function could have been reallo-

cated to another employee. The County, however, considers this argument a red herring; whether Dark should be made to drive on the public roads is beside the point when the job's essential function is the operation of heavy equipment, occupying 65% of total work time.

**[18]** The ADA does not require an employer to exempt an employee from performing essential functions or to reallocate essential functions to other employees. *See* 29 C.F.R. Part 1630, App. ("An employer or other covered entity may restructure a job by reallocating or redistributing nonessential, marginal job functions."); *Phelps v. Optima Health, Inc.*, 251 F.3d 21, 26 (1st Cir. 2001). The County thus need not restructure Dark's position by exempting him from the essential duty of operating heavy machinery. Dark has not shown job restructuring was an available option.

ii

**[19]** Then there is the possibility of reassignment. Dark is a qualified individual under the ADA if he can "perform the essential functions of a reassignment position, with or without reasonable accommodation, even if [he] cannot perform the essential functions of the current position." *Hutton*, 273 F.3d at 892; *see also* 42 U.S.C. § 12111(9) (noting that reasonable accommodation may include reassignment to a vacant position).

As noted, Dark offered the possibility of "[r]eassignment to a vacant position, either temporary or permanent," and alleges that the "evidence shows [that] there were a number of open positions for which [he] was qualified around the time of his discharge."[6] The County does not reject the possibility of

---

[6] Dark suggests he could have been reassigned to "weed control, flagging, clerical, mechanic, data entry, reception, surveyor assistant, building maintenance, and sign making." As to Dark's qualifications for these positions, the record indicates that his only limitation pertained to the possibility of injury should he become unconscious. Save flagging, there is no such danger inherent in any of the proposed reassignments.

reassignment, but merely points out that the affidavit serving as Dark's evidence for the availability of reassignment states only that certain positions "have become available" since his termination, not that they were available *at that time*.

**[20]** Dark's response is to cite two Tenth Circuit cases, *Smith v. Midland Brake, Inc.*, 180 F.3d 1154 (10th Cir. 1999), and *Boykin v. ATC/Vancom of Colorado, L.P.*, 247 F.3d 1061 (10th Cir. 2001). These cases hold that vacant positions to which a disabled employee may be reassigned include those "that the employer reasonably anticipates will become vacant in the fairly immediate future." *Midland Brake*, 180 F.3d at 1175 (citation omitted).

**[21]** The proposition Dark advances is consistent with our previous holding that "the duty to accommodate is a continuing duty that is not exhausted by one effort." *Humphrey*, 239 F.3d at 1138. It is also contemplated within the EEOC guidelines. *See* 29 C.F.R. Part 1630, App. (advising that reassignment is reasonable "if the position is vacant within a reasonable amount of time," which "should be determined in light of the totality of the circumstances"). We adopt the Tenth Circuit's rule: in considering reassignment as a reasonable accommodation, an employer must consider not only those contemporaneously available positions but also those that will become available within a reasonable period. Therefore, we conclude that there is a genuine issue of material fact as to whether Dark could have been accommodated through reassignment.[7]

---

[7]Dark does not specify when these jobs became available, except that they became available since his termination—sometime between April 17, 2002, and September 6, 2004 (the date of his affidavit). In at least one prior case, we have not required any greater specificity. *See McGregor v. Nat'l R.R. Passenger Corp.*, 187 F.3d 1113, 1115 (9th Cir. 1999) ("But Amtrak's own expert stated that in 1995 and 1996 there were twelve 'appropriate openings' for which McGregor was qualified despite her disability.").

iii

Finally, Dark argues that the County could have reasonably accommodated his disability by allowing his use of accumulated sick leave or unpaid medical leave. He claims to have offered the use of his 712 hours (89 days) of accumulated sick leave "until the seizure issue could be resolved" by the adjustment of his medication levels. On appeal, the County's response is simply to assert that the ADA does not require their agreement to this proposal.

[22] In *Nunes*, we held that "[u]npaid medical leave may be a reasonable accommodation under the ADA. . . . Even an extended medical leave, or an extension of an existing leave period, may be a reasonable accommodation if it does not pose an undue hardship on the employer." 164 F.3d at 1247; *see also* 29 C.F.R. Part 1630, App. (stating that a reasonable accommodation "could include permitting the use of accrued paid leave or providing additional unpaid leave for necessary treatment")*; Humphrey*, 239 F.3d at 1135-36 (holding that an employee need not show that the proposed medical leave is "certain or even likely to be successful" (citing *Kimbro*, 889 F.2d at 879)).[8]

[23] Although recovery time of unspecified duration may not be a reasonable accommodation (primarily where the employee will not be able to return to his former position and cannot state when and under what conditions he could return to work at all), *see Taylor v. Pepsi-Cola Co.*, 196 F.3d 1106 (10th Cir. 1999), the County was obligated to consider this

---

[8]The facts of *Nunes* are a significant parallel to those here: an otherwise satisfactory employee suffered fainting spells on the job, and the employee sought a leave of absence in order to gain control over the condition by learning stress reduction techniques to control her symptoms. *See* 164 F.3d at 1245-47; *see also Kimbro,* 889 F.2d at 879 (holding that an employee who suffered from migraine episodes was justified in requesting a temporary leave of absence as an accommodation for his disability where the leave would have allowed his doctor to formulate an effective treatment).

option under the particular circumstances of Dark's case. As such, there remains a genuine issue of material fact as to whether Dark could reasonably have been accommodated by his request for leave sufficient to permit his transition to new medication.[9]

---

[9]The County objects to this entire line of analysis, arguing that accommodation of Dark would be *per se* unreasonable. It argues that "[i]f an employee does not control his disability and fails to meet the employer's legitimate job expectations, the employer may lawfully terminate the employee's employment." For this proposition, the County cites *Siefken v. Village of Arlington Heights*, 65 F.3d 664 (7th Cir. 1995), in which a municipality permissibly terminated a police officer's employment because he failed to control his diabetes, and *Hill v. Kansas City Area Transp. Auth.*, 181 F.3d 891 (8th Cir. 1999), in which a municipality fired a bus driver who fell asleep twice on the job due to a combination of medications she was taking to control hypertension.

We think that those cases are distinguishable. Hill requested, as an accommodation, "a drug screening that would have identified a combination of pain and hypertension medications that would not cause drowsiness." The court considered this request unreasonable because it "was not within her employer's control. . . . [The employer] controlled Hill's work conditions, but it was not her doctor or pharmacist." *Id.* Dark, in contrast, requests accommodations that are very much within the County's control, *e.g.*, reassignment or medical leave. In the same vein, Dark, unlike Siefken, actually needs an accommodation and requests a change in the ordinary terms and conditions of his work—not simply a "second chance" to change his own behavior. *See* 65 F.3d at 666-67. Moreover, Dark, unlike Hill, did not "ignore[ ] the problem until [his] work performance warranted discharge." Hill had repeated work attendance problems due to her oversleeping and was twice found asleep on her bus. *Id.* at 893. Dark simply encountered a single work-related episode due to a temporary change in his medication.

In any case, *Nunes* demonstrates that our court has not taken an approach as unforgiving as that exhibited in these cases from the Seventh and Eight Circuits. *See* 164 F.3d at 1245-47; *see also Humphrey*, 239 F.3d at 1137 ("It would be inconsistent with the purposes of the ADA to permit an employer to deny an otherwise reasonable accommodation because of past disciplinary action taken due to the disability sought to be accommodated."). We therefore reject the County's argument.

### 3

**[24]** We are satisfied that there remains a genuine issue of material fact as to whether Dark was qualified with reasonable accommodation.

### C

**[25]** Finally, Dark contends that there is a genuine issue of material fact as to whether he poses a "direct threat" to the safety of others. Under the ADA, an employer is entitled to defend the adverse employment action on the ground that "an individual [poses] a direct threat to the health or safety of other individuals in the workplace." 42 U.S.C. § 12113(b).

For purposes of this summary judgment motion, it matters not whether we consider the County's asserted defense under the rubric of "direct threat" or "business necessity." *See generally Morton*, 272 F.3d at 1258-61 (citations omitted) (distinguishing the two defenses and explaining the scope of each). We need only point out that both defenses incorporate a requirement that the qualification standards be incapable of modification through a reasonable accommodation that would permit the disabled employee to meet those standards. *See* 42 U.S.C. § 12113(a); *Morton*, 272 F.3d at 1262-63; *Hutton*, 273 F.3d at 893.

**[26]** Thus, we must conclude that the County's defense suffers from the very same defect that foreclosed summary judgment on the "qualified individual" issue. *See supra* Part II.B. As we have already determined, there remains a genuine question of material fact as to whether a reasonable accommodation—such as temporary reassignment or the use of medical leave—could have eliminated the need for application of the "seizure-free" requirement resulting in Dark's termination. The County has not met its burden and is therefore not entitled to the defense on summary judgment.

## III

Whatever the ultimate success of Dark's ADA claim on the merits, we conclude that he is entitled to a jury trial and that the County is not entitled to summary judgment.

**REVERSED and REMANDED.**