**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| TIMOTHY JAMES MAYO, *Plaintiff-Appellant*, <br><br> v. <br><br> PCC STRUCTURALS, INC., an Oregon corporation, *Defendant-Appellee*. | No. 13-35643 <br><br> D.C. No. 3:12-cv-00145-KI <br><br><br> OPINION |

Appeal from the United States District Court
for the District of Oregon
Garr M. King, Senior District Judge, Presiding

Argued and Submitted
July 8, 2015—Portland, Oregon

Filed July 28, 2015

Before: N. Randy Smith and John B. Owens, Circuit
Judges, and William Q. Hayes,[*] District Judge.

Opinion by Judge Owens

---

[*] The Honorable William Q. Hayes, District Judge for the U.S. District Court for the Southern District of California, sitting by designation.

## SUMMARY[**]

### Employment Discrimination

Affirming the district court's summary judgment on a claim of employment discrimination in violation of Oregon disability law, and agreeing with other circuits, the panel held that because the plaintiff had threatened to kill certain co-workers, he was not a "qualified individual" under the Oregon statute.

### COUNSEL

Mary Ellen Page Farr (argued), Portland, Oregon; David D. Park, Elliott & Park, P.C., Portland, Oregon, for Plaintiff-Appellant.

Brenda K. Baumgart (argued) and Karen L. O'Connor, Stoel Rives LLP, Portland, Oregon, for Defendant-Appellee.

### OPINION

OWENS, Circuit Judge:

Timothy Mayo appeals from the district court's grant of summary judgment in favor of his former employer, PCC Structurals, Inc., on his claim of discrimination in violation of

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Oregon disability law. The district court concluded that because Mayo had threatened to kill certain co-workers, he was not a "qualified individual" under the Oregon statute. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

## I.  BACKGROUND

Mayo's career at PCC Structurals (a leader in superalloy, aluminum and titanium casting) began in 1987. Although he was diagnosed in 1999 with major depressive disorder, medication and treatment enabled him to work without significant incident for many years. However, things changed in 2010. Mayo (who welded aircraft parts) and some co-workers began to have issues with a supervisor who they claimed was bullying them and making work life miserable. In January 2011, a co-worker complained on a company hotline, which led to a meeting among Mayo, the co-worker, and PCC's Human Resources Director for Oregon about the supervisor's behavior.

Shortly after the meeting, Mayo made threatening comments to at least three co-workers. He told one that he "fe[lt] like coming down [to PCC] with a shotgun an[d] blowing off" the heads of the supervisor and another manager. The co-worker need not worry, Mayo explained, because she would not be working the shift when the killing would occur. Mayo told another co-worker on several occasions that he planned to "com[e] down [to PCC] on day [shift] . . . to take out management." He told a third co-worker that he "want[ed] to bring a gun down [to PCC] and start shooting people." He explained that "all that [he] would have to do to shoot [the supervisor] is show up [at PCC] at 1:30 in the afternoon" because "that's when all the supervisors would have their walk-through."

Mayo's co-workers eventually reported these threats to management via written statements. PCC's Senior Human Resources Manager received these statements on February 15, 2011, and called Mayo that same day to discuss them. When asked if he planned to carry out his threats, Mayo said that "he couldn't guarantee he wouldn't do that." The Senior Manager immediately suspended Mayo's employment and barred him from company property. PCC also notified the police.

That evening, a police officer visited Mayo at his home to discuss the threats. Mayo admitted making the threats and that he had two or three people in mind, including the supervisor. He also admitted to owning several guns, though he had not decided which gun to use. When asked if he planned to go to PCC and start shooting people, Mayo responded: "Not tonight."

With Mayo's consent, the officer took Mayo to the hospital, where he was placed into custody because of the danger he posed to himself and others. *See* Or. Rev. Stat. § 426.228(1). Mayo remained in custody for six days, and then took leave under the Oregon Family Leave Act ("OFLA") and the Family and Medical Leave Act ("FMLA") for two months. Toward the end of this leave period, a treating psychologist cleared Mayo to return to work, as he was not a "violent person," but recommended a new supervisor assignment. A treating nurse practitioner sent a similar letter. Mayo also indicated that he wanted to return to PCC, though the parties disagree as to whether Mayo promised that he would not repeat his threatening behavior. On May 20, 2011, PCC terminated Mayo. The parties dispute whether PCC decided to terminate Mayo before or after he began his period of medical leave.

In August 2011, Mayo sued PCC in state court, alleging that his termination violated section 659A.112 of the Oregon Revised Statutes, Oregon's counterpart to the Americans with Disabilities Act ("ADA").[1] He argued that his "disturbing statements and comments . . . were the symptoms of and caused by his disability," thus making his termination discriminatory. PCC removed the case to federal court in January 2012.

In July 2013, the district court granted PCC's motion for summary judgment. Following the decisions of numerous other circuits, it reasoned that Mayo was no longer a "qualified individual" once he made his "violent threats." And "[b]ecause Mayo [wa]s not a qualified individual," he was not "entitled to protection under the ADA and Oregon's disability discrimination statute."

## II. STANDARD OF REVIEW

"The district court's grant of a motion for summary judgment is reviewed de novo. The reviewing court applies the same standard used by the district court under Federal Rule of Civil Procedure 56(c). Therefore, this court must determine, viewing the evidence in the light most favorable to the nonmoving party, whether any genuine issues of

---

[1] "The Oregon disability discrimination statute is modeled after the ADA. Accordingly, we interpret [the statute] consistently with the ADA." *Hutton v. Elf Atochem N. Am., Inc.*, 273 F.3d 884, 891 n.1 (9th Cir. 2001) (citation omitted); *see* Or. Rev. Stat. § 659A.139(1) ("659A.103 to 659A.144 shall be construed to the extent possible in a manner that is consistent with any similar provisions of the [ADA].").

Mayo also alleged violations of the OFLA and the FMLA. He later withdrew those claims, so they are not before us.

material fact exist and whether the district court correctly applied the relevant substantive law." *Hutton*, 273 F.3d at 891 (citations omitted).

## III.  ANALYSIS

We apply the familiar burden-shifting framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973), to claims under Oregon disability law. *See Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1092–93 (9th Cir. 2001). "Under that framework, an employee challenging an adverse employment action has the initial burden of establishing a prima facie case of discrimination (or retaliation). The burden then shifts to the employer to provide a legitimate, nondiscriminatory (or nonretaliatory) reason for the adverse employment action. If the employer does so, then the burden shifts back to the employee to prove that the reason given by the employer was pretextual." *Curley v. City of North Las Vegas*, 772 F.3d 629, 632 (9th Cir. 2014).

Our analysis begins and ends with Mayo's prima facie case, as he fails to make one. "To prevail on an ADA claim of unlawful discharge, the plaintiff must establish a prima facie case by showing that: (1) he is a disabled person within the meaning of the statute; (2) he is a qualified individual with a disability; and (3) he suffered an adverse employment action because of his disability." *Hutton*, 273 F.3d at 891. Under Oregon disability law, like the ADA, "an individual is qualified for a position if the individual, with or without reasonable accommodation, can perform the essential functions of the position." Or. Rev. Stat. § 659A.115; *see* 42 U.S.C. § 12111(8) (ADA analogue).

Even if Mayo were disabled (which we assume for this appeal), he cannot show that he was qualified at the time of his discharge. An essential function of almost every job is the ability to appropriately handle stress and interact with others. *See Williams v. Motorola, Inc.*, 303 F.3d 1284, 1290 (11th Cir. 2002). And while an employee can be qualified despite adverse reactions to stress, he is not qualified when that stress leads him to threaten to kill his co-workers in chilling detail and on multiple occasions (here, at least five times). This vastly disproportionate reaction demonstrated that Mayo could not perform an "essential function" of his job, and was not a "qualified individual." This is true regardless of whether Mayo's threats stemmed from his major depressive disorder. *Cf. Newland v. Dalton*, 81 F.3d 904, 906 (9th Cir. 1996) ("Attempting to fire a weapon at individuals is the kind of egregious and criminal conduct which employees are responsible for regardless of any disability.").

A contrary rule would place employers in an impossible position. *See Weaving v. City of Hillsboro*, 763 F.3d 1106, 1114 (9th Cir. 2014) (rejecting a holding that would force employers to choose between ADA liability and "a hostile workplace environment"). As the Seventh Circuit explained in a similar case of employee threats caused by major depression:

> The Act does not require an employer to retain a potentially violent employee. Such a requirement would place the employer on a razor's edge—in jeopardy of violating the Act if it fired such an employee, yet in jeopardy of being deemed negligent if it retained him and he hurt someone. The Act protects only "qualified" employees, that is, employees

> qualified to do the job for which they were hired; and threatening other employees disqualifies one.

*Palmer v. Circuit Court*, 117 F.3d 351, 352 (7th Cir. 1997). Or as the First Circuit has explained: "Put simply, the ADA does not require that an employee whose unacceptable behavior threatens the safety of others be retained, even if the behavior stems from a mental disability. Such an employee is not qualified." *Calef v. Gillette Co.*, 322 F.3d 75, 87 (1st Cir. 2003).

We agree with our sister circuits.[2] An employee whose stress leads to serious and credible threats to kill his co-workers is not qualified to work for the employer, regardless of why he makes those threats. We have not located any

---

[2] *See also Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 809, 813 (6th Cir. 1999) (following *Palmer* and holding plaintiff not qualified because he told school board members "You'll be sorry for this" and "You will regret this"); *Williams*, 303 F.3d at 1290; *Valentine v. Standard & Poor's*, 50 F. Supp. 2d 262, 287–89 (S.D.N.Y. 1999) (Sotomayor, J.), *aff'd*, 205 F.3d 1327 (2d Cir. 2000) (unpublished table decision); *Adams v. Alderson*, 723 F. Supp. 1531, 1532 (D.D.C. 1989), *aff'd sub nom. Adams v. GSA*, No. 89-5265, 1990 WL 45737 (D.C. Cir. Apr. 10, 1990) (per curiam); *Mammone v. President & Fellows of Harvard Coll.*, 847 N.E.2d 276, 286–92 (Mass. 2006); *Collins v. Blue Cross Blue Shield of Mich.*, 579 N.W.2d 435, 441 (Mich. Ct. App. 1998) (per curiam).

The EEOC has reached the same conclusion. *See* U.S. Equal Emp. Opportunity Comm'n, EEOC Enforcement Guidance on the Americans with Disabilities Act and Psychiatric Disabilities (Mar. 25, 1997), 1997 WL 34622315, at *16 (advising that an employee who "has a hostile altercation with his supervisor and threatens the supervisor with physical harm" is "no longer a qualified individual"); *Ferrell v. West*, EEOC Petition No. 03960032, 1997 WL 177246, at *9 (Apr. 9, 1997) (following *Palmer*).

cases, regulations, or guidance that disagree with this common sense principle.

Despite this lack of authority, Mayo argues that more is required before an employee who makes violent threats can be found not qualified. In particular, he asserts that an individualized assessment under the rubric of the "direct threat" defense is needed. *See* Or. Admin. R. 839-006-0244(1) ("[A]n employer may refuse to employ an individual with a disability posing a direct threat to the health or safety of others."); *see also* 42 U.S.C. § 12113(b) (ADA analogue); *Echazabal v. Chevron USA, Inc.*, 336 F.3d 1023, 1027 (9th Cir. 2003) (describing "direct threat" defense). But as we explained in *Curley*, the "direct threat" defense focuses on a prospective threat of violence; it allows an employer to terminate an employee who "*pose*[*s*] a danger to other employees" or has demonstrated a "potential of *future* violence." 772 F.3d at 633 (emphases added); *see also Bodenstab v. County of Cook*, 569 F.3d 651, 658–59 (7th Cir. 2009). In this case, we do not conclude that Mayo's termination was permissible because his threats demonstrated that he posed a "potential of future violence." Instead, as explained above, we conclude that his termination was permissible because his stress led to death threats. Mayo was unable to appropriately handle stress and interact with others —an "essential function" of his job.**[3]** Neither our precedent

---

**[3]** This same reasoning answers the objection that our holding effectively creates a new judicial exception unsupported by the text of the ADA or Oregon disability law. We do not hold that employees who make violent threats, like illegal drug users, are simply not entitled to the protection of disability discrimination law as a matter of policy, regardless of whether they can perform their jobs or not. *See* Or. Rev. Stat. § 659A.124; 42 U.S.C. § 12114(a). We hold that such employees have demonstrated they are not "qualified individual[s]." Or. Rev. Stat. §§ 659A.112, .115;

nor ADA regulations require an individualized assessment of future risk in this context.

We also reject Mayo's arguments that he was still a "qualified individual" under the terms of the rule that we join our sister circuits in adopting. Though he argues that the cases cited above are distinguishable because they involved more extreme facts (which is highly debatable), Mayo's credible, detailed, and unwavering plan to kill his supervisors more than adequately demonstrated that he lacked the ability to appropriately handle stress and interact with others.[4] Mayo is also wrong to suggest that he just needed a "reasonable accommodation," namely different supervisors. *See* Or. Rev. Stat. § 659A.115 (employee is qualified if he can perform "essential functions" of position with "reasonable accommodation"); 42 U.S.C. § 12111(8) (same). Even now, he does not dispute that another disturbing incident might have occurred if he had returned to PCC and faced similarly stressful conditions. Giving Mayo a different supervisor, therefore, would not have changed his inappropriate response to stress—it would have just removed one potential stressor

---

42 U.S.C. §§ 12111(8), 12112.

[4] We emphasize that we only address the extreme facts before us in this case: an employee who makes serious and credible threats of violence toward his co-workers. We do not suggest that off-handed expressions of frustration or inappropriate jokes necessarily render an employee not qualified. Nor do we imply that employees who are simply rude, gruff, or unpleasant fall in the same category as Mayo. *See* U.S. Equal Emp. Opportunity Comm'n, *supra*, at *15 (advising that an "anti-social" employee with a "psychiatric disability" can be a "qualified individual," even if he is "abrupt and rude").

and possibly added another name to the hit list.**[5]**  Mayo's objection that compliance with conduct standards prohibiting violent threats is "not fundamental to the work of a welder" is similarly unavailing.  The logic of our holding is that compliance with such fundamental standards is an "essential function" of almost every job.  Although it is possible to think of isolated jobs that involve little interaction with others, Mayo's position as a welder—in which he had many co-workers and was under the supervision of a number of individuals—is not one of these rare exceptions.

This ruling is consistent with our cases holding that "conduct resulting from a disability is considered to be part of the disability, rather than a separate basis for termination." *Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1139–40 (9th Cir. 2001); *see also Gambini v. Total Renal Care, Inc.*, 486 F.3d 1087, 1094–95 (9th Cir. 2007); *Dark v. Curry County*, 451 F.3d 1078, 1084 (9th Cir. 2006).  Unlike in *Humphrey*, *Gambini*, and *Dark*, we do not need to consider whether PCC has offered a legitimate, nondiscriminatory reason for terminating Mayo, as he has failed to establish a prima facie case at step one of the *McDonnell Douglas* framework.  Our holding is also consistent with the facts and arguments made in those cases.

In *Humphrey*, the employer hospital argued that a medical transcriptionist was not a "qualified individual" because her obsessive compulsive disorder prevented her from regularly and predictably showing up for her job.  239 F.3d at 1135.

---

**[5]** This is borne out by the fact that Mayo arguably *did* receive this accommodation prior to making his violent threats.  Although Mayo was not transferred to a different plant as he now proposes, PCC did honor his request for a transfer to a different shift in late 2010.

But as this court held, the employee was still a "qualified individual" because the hospital could have allowed her to do her job from home or take a leave of absence. *See id.* In *Dark*, the employee, a maintenance and construction worker, caused an accident when he ignored signs that he was likely to have a seizure and fell unconscious while driving a pickup truck. 451 F.3d at 1081. Nevertheless, his employer, a county road department, never argued that his failure to be more forthcoming rendered him unqualified—only that his "uncontrolled epilepsy" rendered him incapable of operating the heavy machinery that his job entailed. This court disagreed, noting that the road department might have been able to accommodate the employee through reassignment or a period of leave. *See id.* at 1087–90. And in *Gambini*, the employee, a contracts clerk, effectively had a temper tantrum after she received a negative performance review from her supervisors. 486 F.3d at 1091–92. Though this court held that her "violent outburst" was protected as "part and parcel of her disability" if it stemmed from her bipolar disorder, we specifically noted in response to a petition for rehearing that her employer, a dialysis provider, was free to argue that she was not a "qualified individual." *See id.* at 1094–95.

None of these cases featured an employer that persuasively argued that the employee was not a "qualified individual" because of his or her disability. PCC has done so here. We thus conclude that the facts in this case compel a different result, and we join several other courts in holding that an employee whose stress leads to violent threats is not a "qualified individual."

## IV. CONCLUSION

Depression and mental illness are serious problems that affect millions of Americans, including many lawyers and judges. We do not minimize the struggles of those who suffer from these ailments or suggest that all such individuals are incapable of working. But we disagree with Mayo that employers must simply cross their fingers and hope that violent threats ring hollow. All too often Americans suffer the tragic consequences of disgruntled employees targeting and killing their co-workers. While the ADA and Oregon disability law protect important individual rights, they do not require employers to play dice with the lives of their workforce. We thus conclude that PCC's actions in this case were lawful.

**AFFIRMED.**