# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

STEPHANIE GAMBINI,
        *Plaintiff-Appellant,*

v.

TOTAL RENAL CARE, INC., d/b/a
DAVITA, INC.,
        *Defendant-Appellee.*

No. 05-35209

D.C. No.
CV-03-05459-RBL

ORDER
AMENDING
OPINION AND
AMENDED
OPINION

Appeal from the United States District Court
for the Western District of Washington
Ronald B. Leighton, United States District Court Judge

Argued October 27, 2006
Submitted March 1, 2007
Seattle, Washington

Filed March 8, 2007
Amended April 24, 2007

Before: Alfred T. Goodwin and Alex Kozinski,
Circuit Judges, and Milton I. Shadur,* Senior District Judge.

Opinion by Judge Shadur

---

*The Honorable Milton I. Shadur, Senior United States District Judge
for the Northern District of Illinois, sitting by designation.

## COUNSEL

Michael C. Subit and Sean M. Phelan, Frank Freed, Subit & Thomas, LLP, Seattle, Washington, for the plaintiff-appellant.

Patricia K. Buchanan and Pamela J. DeVet, Lee, Smart, Cook, Martin & Patterson, P.S., Seattle, Washington, for the defendant-appellee.

## ORDER

After review of (a) the petition for rehearing filed by appellee Total Renal Care Inc. d/b/a DaVita, Inc. ("DaVita"), coupled with its motion to withdraw a portion of our opinion and to certify a question to the Washington Supreme Court, and (b) the motion by Washington Retail Association for leave to file a brief amicus curiae in support of that petition and motion, we:

    1.   deny DaVita's petition for rehearing and its accompanying motion;

    2.   grant leave to file the amicus curiae brief; and

    3.   amend our opinion filed on March 8, 2007, slip op. 2685, by inserting the following two paragraphs at page 2697, after line 6 and immediately above the caption *"Failure To Offer Instruction on 'Direct Threat' Defense"*:

In its petition for rehearing, which has been joined by an amicus brief, DaVita argues that "[n]either the *Riehl* nor *Humphrey* Courts state or imply that arguably disabled employees are entitled to absolute protection regardless of their transgressions against the employer, let alone *more* protection than would be afforded a non-disabled employee for the same misconduct." But the law often does provide more protection for individuals with disabilities. Unlike other types of discrimination where identical treatment is the gold standard, identical treatment is often not equal treatment with respect to disability discrimination—*see, e.g., Holland* v. *Boeing Co.*, 583 P.2d 621, 623 (Wash. 1978) (en banc) ("Identical treatment may be a source of discrimination in the case of the handicapped, whereas *different* treatment may eliminate discrimination against the

handicapped and open the door to employment opportunities."). That's why the ADA and Washington Law require employers to make reasonable accommodations for disabilities.

That said, requiring Prop. Instr. 26 in no way provides employees with *absolute* protection from adverse employment actions based on disability-related conduct. Under the ADA a plaintiff must still establish that she is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires" (42 U.S.C. § 12111(8)). Washington Law has a similar provision: "[T]he prohibition against discrimination because of such disability shall not apply if the particular disability prevents the proper performance of the particular worker involved" (Wash. Rev. Code § 49.60.180(1)). Even if a plaintiff were to establish that she's qualified, under the ADA the defendant would still be entitled to raise a "business necessity" or "direct threat" defense against the discrimination claim (*see* 42 U.S.C. § 12113(a)-(b)). Defendant may also raise the defense that the proposed reasonable accommodation poses an undue burden (*see id.* § 12111(10)). Here DaVita would be able to raise any analogous defenses available to it under Washington Law. Our holding is thus far less controversial and sweeping than DaVita and the amici proclaim.

## OPINION

SHADUR, Senior District Judge:

Stephanie Gambini ("Gambini") appeals the district court's denial of her renewed motion, alternatively seeking judgment

as a matter of law and a new trial, following a jury verdict in favor of her former employer Total Renal Care, Inc., d/b/a DaVita, Inc. ("DaVita"). Gambini originally brought suit in Pierce County Superior Court in Tacoma, Washington, charging that DaVita had discriminated against her in violation of the Washington Law Against Discrimination ("Washington Law," Wash. Rev. Code §§ 49.60.010 to 49.60.401) and the Family Medical Leave Act ("FMLA," 29 U.S.C. §§ 2601 to 2654). DaVita then timely removed the case to the United States District Court for the Western District of Washington, where DaVita prevailed at trial. We affirm as to Gambini's FMLA claim, but reverse and remand as to her Washington Law claim.

*Background*

In November 2000 Gambini began working as a contracts clerk at DaVita, a company that provides dialysis to renal patients. It is undisputed that Gambini had a history of health problems that predated her employment at DaVita. After several months at DaVita she began to experience depression and anxiety, and in April 2001 she experienced an emotional breakdown at work. Gambini eventually met with a mental health provider at the community health clinic and was told that her symptoms were consistent with bipolar disorder.

Upon returning to work several days later, Gambini informed her supervisor Robin Warren ("Warren") that she was seeking medical treatment for bipolar disorder. When Warren was promoted in May 2001, DaVita replaced her with Carrie Bratlie ("Bratlie"), who became Gambini's new direct supervisor. Gambini also told Bratlie that she was suffering from bipolar disorder and requested several accommodations. In addition, Gambini told her co-workers that she was experiencing mood swings, which she was addressing with medications, and asked that they not be personally offended if she was irritable or short with them. Gambini privately divulged

to Bratlie that she was seeing a therapist and struggling with some medication issues.

Gambini's bipolar symptoms grew more severe in April 2002 — she found herself increasingly irritable and easily distracted and began to have a hard time concentrating or assigning priorities as between her tasks. Gambini admitted to a fellow co-worker, who also suffered from bipolar disorder, that she was struggling to perform her job because of her symptoms. That co-worker recommended that Gambini seek treatment from psychiatric nurse practitioner Bobbie Fletcher ("Fletcher"), who confirmed Gambini's bipolar disorder based on Gambini's "short fuse," high energy, and propensity to exhibit anger and irritability.

During that period Gambini's current and former supervisors, Warren and Bratlie, convened to discuss Gambini's attitude and what they perceived as her poor job performance. Their meeting culminated in a decision to deliver a written performance improvement plan to Gambini at a later meeting that would include Bratlie, Gambini, and Gina Lovell ("Lovell"), the Supervisor of Payor Contracting. Accordingly, on July 11, 2002 Bratlie emailed Gambini, requesting that she come to Bratlie's office without indicating any specific purpose for the meeting.

Upon arriving at Bratlie's office Gambini was already agitated because she did not know the purpose of the meeting or why Lovell was in attendance. When Bratlie presented Gambini with the improvement plan, the first sentence of which stated, "[Gambini's] attitude and general disposition are no longer acceptable in the SPA department," Gambini began to cry. Reading the remainder of the document did not alleviate Gambini's symptoms—instead she found her face growing hot and felt a tightening feeling in her chest, as well as shortness of breath and shaking. When she had finished reading the performance plan, Gambini threw it across the desk and in a flourish of several profanities expressed her opinion that it

was both unfair and unwarranted. Before slamming the door on her way out, Gambini hurled several choice profanities at Bratlie. There is a dispute about whether during her dramatic exit Gambini warned Lovell and Bratlie that they "will regret this," but Bratlie did observe Gambini kicking and throwing things at her cubicle after the meeting. Back at her cubicle, Gambini tried unsuccessfully to call Fletcher to tell her about how upset the meeting made her feel and about her ensuing suicidal thoughts.

Gambini reported for work the next morning and received a return phone call from Fletcher who, alarmed about Gambini's suicidal thoughts, told Gambini to go directly to the hospital. Gambini told Bratlie that she needed to check into the hospital, and Bratlie asked Gambini's boyfriend Todd DeMille ("DeMille") to pick her up and take her to the hospital. When DeMille arrived, Bratlie gave him FMLA forms for Gambini to fill out. She also signed the personnel change notice for Gambini's leave request. Gambini went straight from work to St. Joseph's Hospital, where her bipolar diagnosis was reconfirmed.

On July 16 DaVita provisionally approved Gambini's request for FMLA leave, subject to medical certification from her health care provider. Additionally, DaVita's human resource generalist Mara McLemore ("McLemore") began an investigation into the July 11 meeting with Gambini by interviewing Gambini's supervisors. During the investigation McLemore asked Bratlie via email about Gambini's expected date of return. During the same time frame several employees sent emails to McLemore stating concerns about Gambini's outburst. For example, one employee specifically requested that Gambini be prevented from returning to work.

On the following business day, McLemore and Bratlie called Gambini on her cell phone to tell her that her employment was being terminated. Three days later Gambini sent DaVita a letter stating that her behavior during the July 11 meeting

was a consequence of her bipolar disorder and asking DaVita to reconsider its decision to terminate her. When DaVita refused to reconsider, Gambini filed this action, which proceeded to trial in December 2004.

At trial Gambini objected to the district court's substantive jury instructions on each of her legal claims. After a seven-day jury trial, the jury returned a verdict in favor of DaVita on all claims. After the trial court denied her post-trial alternative motion, Gambini filed a timely appeal to this court, challenging the giving of several jury instructions as well as the failure to give her proffered Instructions 11, 12, 21, 26, 27, 30 and 33.[1]

### Standard of Review

Where a challenge to jury instructions is at issue, "prejudicial error results when, looking to the instructions as a whole, the substance of the applicable law was not fairly and correctly covered" (*Swinton v. Potomac Corp.*, 270 F.3d 794, 802 (9th Cir. 2001), quoting earlier caselaw (internal citations omitted)). Where an error is merely harmless, reversal is not required (*Wall Data Inc. v. Los Angeles County Sheriff's Dep't*, 447 F.3d 769, 784 (9th Cir. 2006)). As *Wall Data*, *id.* teaches, "We review a district court's formulation of civil jury instructions for an abuse of discretion," and "[w]e review *de novo* whether a jury instruction misstates the law." Here analysis reveals that the trial court committed reversible error when it refused to give Gambini's Prop. Instr. 26 because it failed "fairly and adequately" to cover the issues presented and to state the law correctly, and because it was ultimately misleading. And because the case will have to be retried, we address other questioned instructions as well.

---

[1]Throughout this opinion, Gambini's proposed instructions will be cited as "Prop. Instr. ___" and the jury instructions as given will be cited as "Instr. ___."

*Swinton*, 270 F.3d at 805-06 (quoting earlier caselaw, with internal citations omitted) reconfirmed the standard for evaluating a verdict where the jury has been given an incorrect instruction:

> An error in instructing the jury in a civil case requires reversal unless the error is more probably than not harmless. While this standard of review is less stringent than review for harmless error in a criminal case, it is more stringent than review for sufficiency of the evidence in which we view the evidence in the light most favorable to the prevailing party. In reviewing a civil jury instruction for harmless error, the prevailing party is not entitled to have disputed factual questions resolved in his favor because the jury's verdict may have resulted from a misapprehension of law rather than from factual determinations in favor of the prevailing party.

That yardstick will be applied in our review of the actual and proposed jury instructions at issue on this appeal.

### Instructions Regarding Gambini's Disparate Treatment Claim

*Instruction as to Conduct Resulting from Disability*

Gambini submitted and the trial court denied Prop. Instr. 26:

> Conduct resulting from a disability is part of the disability and not a separate basis for termination.

We conclude (1) that the district court abused its discretion when it declined to give that instruction and (2) that such exclusion was not harmless error.

[1] Most significantly, the Washington Supreme Court has itself enunciated the rule embodied in that instruction. On that

score *Riehl v. Foodmaker, Inc.*, 94 P.3d 930, 938 (Wash. 2004)(en banc) has stated explicitly:

> Conduct resulting from the disability . . . is part of the disability and not a separate basis for termination.

In so doing *Riehl* drew on our own holding in *Humphrey v. Memorial Hospitals Ass'n*, 239 F.3d 1128, 1139-40 (9th Cir. 2001), which in the context of the Americans With Disabilities Act ("ADA") similarly articulated that "conduct resulting from a disability is considered part of the disability, rather than a separate basis for termination." As a practical result of that rule, where an employee demonstrates a causal link between the disability-produced conduct and the termination, a jury must be instructed that it may find that the employee was terminated on the impermissible basis of her disability.

Because of the Washington Supreme Court's express reliance on *Humphrey*, we may properly look to that decision in applying the Washington Law. Indeed, the facts in *Humphrey* are substantially analogous to Gambini's situation, and we held there (239 F.3d at 1140) that a jury could reasonably find the "requisite causal link between" the symptoms of obsessive compulsive disorder and Humphrey's inability to conform her behavior to her employer's expectations of punctuality and attendance, so that she was fired because of her disability.

As we have said, that principle has been adhered to by the Washington Supreme Court, again in analogous circumstances. In *Riehl*, 94 P.3d at 938 an employer terminated and refused to rehire an employee who began to suffer from depression and posttraumatic stress disorder ("PTSD") after approximately five years of service. Evidence that the employee's mental disability motivated the adverse employment action included his supervisor's written comments about the employee's personality change after his illness, which "suggest[ed] he was not the same as the 'old [Riehl]' " (*id.*).

In light of his favorable performance reviews and promotions within the company (*id.* at 937), the supervisor's comments "suggest that [the employer's] decision to fire and/or not rehire Riehl was based on Riehl's personality difference, which may have been caused by his disability" (*id.* at 938). In fact, when Riehl was terminated he was told that the decision was *not* based on his performance (*id.* at 938).

**[2]** Hence the court held that a jury could reasonably find that the mental disability was a "substantial factor" in the adverse employment actions, making the critical point that under Washington law a plaintiff need not prove that the impermissible basis for the adverse employment action—mental disability—was itself "the determining factor" (*id.* at 936). As *Mackay v. Acorn Custom Cabinetry, Inc.*, 898 P.2d 284, 288 ( Wash. 1995) (en banc) explains:

> Washington's disdain for discrimination would be reduced to mere rhetoric if this court were to require proof that one of the attributes enumerated in [the antidiscrimination statute] was a 'determining factor' in the employer's adverse employment decision.

Thus a decision motivated even in part by the disability is tainted and entitles a jury to find that an employer violated antidiscrimination laws.

Failure to have instructed the jury on that score plainly requires reversal. At trial Gambini presented evidence that DaVita signed an interrogatory response, which stated that one of the reasons it terminated Gambini was because she had "frightened her co-workers with her violent outbursts," as "documented by emails to the People Services Department." Her "violent outbursts," like Humphrey's obsessive rituals or Riehl's subdued personality, were arguably symptomatic of her bipolar disorder. Gambini had informed her supervisors about her condition and kept them apprised of her medication issues and the various accommodations she thought might

reduce the chances of an outburst at work. When her temper erupted during the July 11 meeting, Gambini was in the throes of a medication change, which heightened the volatility of the mood swings that she and her health care providers were trying to get under control.

**[3]** Under all the circumstances it was surely permissible for a properly instructed jury to review the events culminating in the July 11 meeting and Gambini's eventual termination and to conclude that it was her personality and not her work product that motivated DaVita. In fact, the very first sentence of the written performance improvement plan that Bratlie presented to Gambini on July 11 stated, "[Gambini's] attitude and general disposition are no longer acceptable in the SPA department." It is undisputed that people who suffer from bipolar disorder struggle to control their moods, which may vacillate wildly from deep depressions to wild frenzies of hypomania. Hence the record is replete with examples of how Gambini's bipolar disorder manifested itself through her irritability, her "short fuse" and her sometimes erratic emotions.

**[4]** Accordingly the jury was entitled to infer reasonably that her "violent outburst" on July 11 was a consequence of her bipolar disorder, which the law protects as part and parcel of her disability. In those terms, if the law fails to protect the manifestations of her disability, there is no real protection in the law because it would protect the disabled in name only. As *School Board of Nassau County, Florida v. Arline*, 480 U.S. 273, 279 (1987) instructs, the disability discrimination laws are necessary because Congress acknowledged that "the American people are simply unfamiliar with and insensitive to the difficulties confront[ing] individuals with handicaps."

**[5]** Gambini was therefore entitled to have the jury instructed that if it found that her conduct at issue was caused by or was part of her disability, it could then find that one of the "substantial reasons" she was fired was her bipolar condi-

tion. Rejection of that instruction cannot be labeled a "harmless error" under the *Swinton* standard.[2]

In its petition for rehearing, which has been joined by an amicus brief, DaVita argues that "[n]either the *Riehl* nor *Humphrey* Courts state or imply that arguably disabled employees are entitled to absolute protection regardless of their transgressions against the employer, let alone *more* protection than would be afforded a non-disabled employee for the same misconduct." But the law often does provide more protection for individuals with disabilities. Unlike other types of discrimination where identical treatment is the gold standard, identical treatment is often not equal treatment with respect to disability discrimination—*see, e.g.*, *Holland* v. *Boeing Co.*, 583 P.2d 621, 623 (Wash. 1978) (en banc) ("Identical treatment may be a source of discrimination in the case of the handicapped, whereas *different* treatment may eliminate discrimination against the handicapped and open the door to employment opportunities."). That's why the ADA and Washington Law require employers to make reasonable accommodations for disabilities.

That said, requiring Prop. Instr. 26 in no way provides employees with *absolute* protection from adverse employment actions based on disability-related conduct. Under the ADA a plaintiff must still establish that she is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires" (42 U.S.C. § 12111(8)). Washington Law has a similar provision: "[T]he

---

[2]We note that had the district court properly instructed the jury as to Gambini's disability-related conduct, her Prop. Instr. 27 would have been redundant. That proposed instruction read:

> An employer cannot fire an employee for poor job performance if the poor job performance was due to a mental disability and reasonable accommodation plausibly would have rectified the performance problem.

prohibition against discrimination because of such disability shall not apply if the particular disability prevents the proper performance of the particular worker involved" (Wash. Rev. Code § 49.60.180(1)). Even if a plaintiff were to establish that she's qualified, under the ADA the defendant would still be entitled to raise a "business necessity" or "direct threat" defense against the discrimination claim (*see* 42 U.S.C. § 12113(a)-(b)). Defendant may also raise the defense that the proposed reasonable accommodation poses an undue burden (*see id.* § 12111(10)). Here DaVita would be able to raise any analogous defenses available to it under Washington Law. Our holding is thus far less controversial and sweeping than DaVita and the amici proclaim.

*Failure To Offer Instruction on "Direct Threat" Defense*

[6] Another instruction refused by the district court was one on the "direct threat" doctrine, codified in the ADA's statutory text at 42 U.S.C. § 12111(3), which provides a defense to employers who terminate an otherwise protected employee because she poses a threat to the health or safety of other individuals in the workplace. In the ADA context *Morton v. United Parcel Service, Inc.*, 272 F.3d 1249, 1259 (9th Cir. 2001)(emphasis in original) described the doctrine as "a very narrow permission to employers to exclude individuals with disabilities *not* for reasons related to performance of their jobs, but because their mere presence would endanger others with whom they work and whom they serve." Gambini tendered her Prop. Instr. 30 to address that subject.

To be sure, we have said in such cases as *Sharpe v. AT&T Co.*, 66 F.3d 1045, 1050 (9th Cir. 1995), there citing *Clarke v. Shoreline Sch. Dist.*, 720 P.2d 793, 806 (Wash. 1986):

> Washington courts look to federal discrimination law to interpret their own discrimination law.

But because the Washington Law does not contain an explicit counterpart to the ADA's "direct threat" provision and its

implementing regulation, the possible incorporation of such a defense into the state's jurisprudence poses an unresolved question.

Most importantly, that is a question that would be inappropriate for us to resolve in the context of this appeal. Even under the federal statutory scheme, that issue becomes relevant if the employer's defense puts the issue into play, and here DaVita did not do so. Instead the heart of DaVita's defense was its claim that Gambini "lost her job because of misconduct."

[7] Because DaVita did not invoke the "direct threat" concept to justify its termination of Gambini, the latter cannot force it to defend a theory that it chose not to pursue. We cannot find the trial court committed error by refusing to include an instruction on this uninvoked defense.

## FMLA Instructions

### Instructions as to FMLA Interference

As for her FMLA interference claim, Gambini asserts that the trial court erroneously gave Instr. 21:

> Plaintiff claims that defendant interfered with her FMLA rights. In order for the plaintiff to establish a violation of the FMLA, she must prove all of the following elements by a preponderance of the evidence:
>
> (1)   plaintiff was eligible for leave under the Family Medical Leave Act;
>
> (2)   plaintiff had a bipolar condition and it constituted a "serious health condition;"
>
> (3)   plaintiff gave defendant appropriate notice of her need to be absent from work; and

(4)   plaintiff's FMLA leave was a negative factor in defendant's decision to terminate her.

According to Gambini, she simply had to prove that DaVita interfered with her FMLA leave without also having to offer any proof about DaVita's motive. Prop. Instr. 11, which was refused by the trial court, spoke only in these terms:

> She has the burden of proving by a preponderance of the evidence that (1) she was entitled to FMLA leave and (2) DaVita interfered with, restrained or denied her FMLA rights.

**[8]** Under the FMLA "employees who must be absent from work because of their own illness, to care for family members who are ill, or to care for new babies" are provided job security (*Bachelder v. Am. W. Airlines, Inc.*, 259 F.3d 1112, 1119 (9th Cir. 2001)). *Bachelder*, *id.*, reminds us that "[t]he FMLA was the culmination of several years of negotiations in Congress to achieve a balance that reflected the needs of both employees and their employers," and the result is that "the Act entitles covered employees up to twelve weeks of leave each year for their own illnesses . . . and guarantees them reinstatement after exercising their leave rights." Thus the statute "creates two interrelated, substantive employee rights: first, the employee has a right to use a certain amount of leave for protected reasons, and second, the employee has a right to return to his or her job or an equivalent job after using protected leave" (*id.* at 1122). Though the FMLA generally confers the right to reinstatement, an employer may still terminate an employee during her leave if the employer would have made the same decision had the employee not taken leave (29 U.S.C. § 2614(a); 29 C.F.R. § 825.216(a)(1)).

**[9]** Gambini objects to Instr. 21 because she contends that it fails to instruct the jury accurately that DaVita had the burden of proving that her federally-protected leave was not a factor in its decision to terminate her employment. But

DaVita offered unrefuted evidence that it would have terminated Gambini for her conduct regardless of whether she had taken her FMLA leave. There was no evidence whatever that DaVita would have retained Gambini had she remained at work after the July 11 altercation. *Mockler v. Multnomah County*, 140 F.3d 808, 812-13 (9th Cir. 1998) held that a jury verdict could not be tainted by an erroneous instruction on a burden of proof where the prevailing party's evidence was undisputed. Similarly, any arguable error in instructing as to the burden of proof would be harmless indeed in light of DaVita's uncontroverted evidence that it would have fired Gambini for her conduct regardless of her leave status.

*Instructions as to Failure To Reinstate After FMLA Leave of Absence*

[10] Gambini also takes issue with the trial court's failure to give this Prop. Instr. 12 as to DaVita's liability for failure to reinstate her after her period of FMLA leave:

> If you find Ms. Gambini was entitled to FMLA leave, DaVita can avoid liability for interfering, denying or restraining her rights under the FMLA by not reinstating her to her former position after leave only if it can demonstrate, by a preponderance of the evidence, that it would have discharged Ms. Gambini for a lawful reason wholly unrelated to her FMLA leave.

Rejecting that proposal, the trial court instead issued Instr. 24:

> Under the FMLA, after the period of qualified leave expires, the employee generally is entitled to be reinstated to the former position or an equivalent one with the same benefits and terms of employment that existed before the employee took the leave. However the FMLA does not protect an employee from disci-

pline or discharge for conduct that violates company policy.

As above, Gambini argues that Instr. 24 misstates the law because it does not require DaVita to prove that her discharge was not motivated by her FMLA leave. Again because of the uncontradicted evidence that DaVita terminated Gambini for conduct unrelated to her FMLA leave, any putative error as to allocating the burden of proof was harmless, and *Wall Data Inc.*, 447 F.3d at 784 has held that reversal is not required where an error is merely harmless.

*Instructions as to Obligation To Accommodate Disability*

Finally, Gambini contends that the trial court instructed the jury erroneously on her failure-to-accommodate claim when this Instr. 15 was accepted over her objection:

> An employer is not required to accommodate an employee's disability if it would impose an undue hardship on the operation of the employer's business. The defendant has the burden of proving that an accommodation would impose an undue hardship on the defendant.

As Gambini would have it, her Prop. Instrs. 21 and 33 should have gone to the jury instead:

> Prop. Instr. 21:
>
> The law does not require an employee to prove that a particular form of accommodation is certain or even likely to be successful in order for it to be a reasonable accommodation. As long as a reasonable accommodation available to an employer could plausibly have enabled a disabled employee to adequately perform her job, the employer is liable for failing to attempt that accommodation.

Prop. Instr. 33:

An employer is not required to accommodate an employee's disability if it would impose an undue hardship on the operation of the employer's business. DaVita has the burden of proving that an accommodation would impose an undue hardship.

An accommodation will be considered an undue hardship on the conduct of the employer's business only if the cost or difficulty is unreasonably high in view of the size of the employer's business, the value of the employee's work, whether the cost can be included in planned remodeling or maintenance, and the requirements of contracts.

**[11]** We reject Gambini's contention. *Morton*, 272 F.3d at 1252 has expressed the operative rule in much the same way as Instr. 15:

It is an act of discrimination to fail reasonably to accommodate a qualified employee with a disability unless the employer can show that such an accommodation would impose an undue hardship.

Thus the instruction tracked the nature of the defendant's burden precisely as the law directs.

Despite that direct parallel, Gambini argues that Instr. 15 is misleading on the premise that the jury would "have no way of knowing that a plaintiff need prove only that a proposed accommodation would *plausibly* have enabled her to perform the essential functions of her job." Gambini contends that the jury would apply the general instructions as to the preponderance of the evidence standard to Instr. 15 and falsely assume that Gambini had a duty to prove "any accommodation she proposed to DaVita was likely to succeed on a more probable than not basis."

**[12]** We disagree. Instr. 15 not only states the law accurately but it nowhere says (or even implies) that Gambini had to make any quantum showing as to the likely success of her suggested accommodation. While Instr. 15 does not expressly define what constitutes "undue hardship," Prop. Instr. 33 does not offer particularly helpful guidance to the jury, because it generally tracks Wash. Admin. Code § 162-22-075, which sets forth the relevant factors for evaluating a claim of undue hardship where an employer will be subject to the costs of remodeling to accommodate *physical* disabilities. That statutory section is silent as to accommodations for mental disabilities and thus provides no aid to the evaluation of Gambini's claim. Moreover, on remand the jury will be instructed that Gambini's disability-related misconduct is protected under Washington Law, rendering Prop. Instr. 33 unnecessary. In sum, the failure to give either Prop. Instr. 21 or Prop. Instr. 33 cannot be labeled as error because the jury was specifically instructed that DaVita had the burden of proving that Gambini's requested reasonable accommodation created an undue hardship.

### Conclusion

Because the only purported errors ascribed to the verdict on Gambini's FMLA claim relate to jury instructions and because we have rejected those challenges, we affirm as to that claim. But as to Gambini's claim under Washington Law, the error in instructing the jury that we have identified here infected the verdict on that claim, requiring a remand for a new trial rather than the entry of a judgment in Gambini's favor as a matter of law.

AFFIRMED in part and REVERSED and REMANDED in part.