ANN WALSH BRADLEY, J. (dissenting).
 

 ¶55 The majority upholds Charles Carlson's termination, concluding the record lacks substantial evidence that the termination was "because of" Carlson's disability. In doing so, it removes the teeth from the Wisconsin Fair Employment Act's protections and creates an unworkable standard. By tossing out the long established inference method of proof in employment discrimination cases, the majority places an untenable burden on all employees with disabilities, and those with mental health disabilities in particular.
 

 ¶56 Thus, the majority becomes the only entity reviewing this matter that discards the inference method and concludes that the termination is lawful. It alone declines to heed the warning that "if the law fails to protect the manifestations of [a] disability, there is no real protection in the law because it would protect the disabled in name only."
 
 Gambini v. Total Renal Care, Inc.
 
 ,
 
 486 F.3d 1087
 
 , 1095 (9th Cir. 2007).
 

 ¶57 I would heed that warning. Because I agree with the administrative law judge who upheld the use of the inference method and determined that Carlson was wrongfully terminated; and with a unanimous LIRC that applied the inference method, determining that Wisconsin Bell wrongfully terminated Carlson; and with the circuit court that concluded that use of the inference method was reasonable; and with the unanimous court of appeals that embraced the long standing use of the inference method and agreed with LIRC that Carlson was wrongfully terminated, I respectfully dissent.
 

 I
 

 ¶58 Prior to his termination, Carlson worked for Wisconsin Bell for approximately 25 years. Majority op., ¶ 7. During this time, Carlson made his employer aware of his bipolar disorder, providing letters from his doctors.
 
 Id.
 
 , ¶ 11.
 

 ¶59 The letters identified Carlson's diagnosis as "bipolar disorder-depressed type."
 
 Id.
 
 They also indicated that "[b]ipolar disorder is a condition characterized by extremes of mood that could manifest in a significant depression with or without problems associated with anxiety and irritability" and that "[e]xtremes of moods can occur rather quickly and [are] often triggered by relatively minor frustrations."
 
 Id.
 

 ¶60 At the time of the events giving rise to his claim, Carlson worked in a Wisconsin Bell call center as a Technical Service Representative. Wisconsin Bell terminated Carlson's employment after Carlson entered a call-blocking health code
 
 [1]
 
 subsequent to learning that he had not passed a test required for a position in another department.
 

 Id.
 
 , ¶¶ 15-20. While he was in the health code status, Carlson "Q-chatted"
 
 [2]
 
 with coworkers.
 
 Id.
 
 , ¶¶ 15-16. Carlson asserted that he entered the health code because he was upset after learning of his test result and that he reached out to co-workers as a coping mechanism.
 
 Id.
 
 , ¶ 19.
 

 ¶61 Carlson brought an employment discrimination claim on the basis of disability. An administrative law judge reinstated Carlson and LIRC upheld that decision.
 
 Id.
 
 , ¶24. In doing so, LIRC applied the "inference method" of determining discriminatory intent. Pursuant to this method, "if an employer discharges a disabled employee for some unsatisfactory conduct, and the employee is able to show that his or her conduct was caused by a disability, the discharge was 'in legal effect' because of the employee's disability."
 
 Id.
 
 , ¶25.
 

 ¶62 The majority concludes that LIRC's "inference method" is inconsistent with
 
 Wis. Stat. § 111.322
 
 (1)
 
 [3]
 
 because it excuses the employee from the burden of proving discriminatory intent. Majority op., ¶ 3. It further determines that the record lacks substantial evidence that Wisconsin Bell terminated Carlson's employment because of his bipolar disorder.
 

 Id.
 

 II
 

 ¶63 The majority removes the teeth from the Wisconsin Fair Employment Act's protections. To succeed on his disability discrimination claim, Carlson must demonstrate that he has a disability, that he received an adverse action from his employer, and that the adverse action was "because of" his disability.
 
 Wal-Mart Stores, Inc. v. LIRC
 
 ,
 
 2000 WI App 272
 
 , ¶ 9,
 
 240 Wis. 2d 209
 
 ,
 
 621 N.W.2d 633
 
 ;
 
 Target Stores v. LIRC
 
 ,
 
 217 Wis. 2d 1
 
 , 9,
 
 576 N.W.2d 545
 
 (Ct. App. 1998). Additionally, the employer must have acted with discriminatory intent.
 
 Racine Unified Sch. Dist. v. LIRC
 
 ,
 
 164 Wis. 2d 567
 
 , 595,
 
 476 N.W.2d 707
 
 (Ct. App. 1991).
 

 ¶64 LIRC's inference method of demonstrating discriminatory intent is based on the premise that the symptoms of a disability are inseparable from the disability itself. If the employee is intentionally discriminated against because of a symptom of a disability, that is the same as intentional discrimination on the basis of the disability.
 

 ¶65 This premise is reasonable and correct. As amicus Disability Rights Wisconsin and the Survival Coalition of Wisconsin persuasively explain by way of analogy, "[e]pilepsy and seizure go hand-in-hand." If an employer terminates an employee with epilepsy for having a seizure, that employee is in effect being terminated "because of" having epilepsy. Likewise here, Carlson was terminated because of his reaction to learning he did not pass a test and the steps he took to reach out to coworkers for support as a means of coping with his bipolar disorder. The termination was "because of" his bipolar disorder.
 
 [4]
 

 ¶66 Contrary to the majority's assertion, the inference method does not relieve the employee of the burden to prove intent. Rather, it reasonably equates discrimination against the symptoms of a disability with discrimination against a person who has a disability.
 
 See
 

 Gambini
 
 ,
 
 486 F.3d at 1093
 
 . The employee still must show a causal link between the manifested symptoms and the adverse action.
 

 ¶67 The inference method is not overly restrictive on employers. An employer can still terminate the employee if he "cannot 'adequately undertake the job-related responsibilities.' "
 
 Target Stores
 
 ,
 
 217 Wis. 2d at 10
 
 ,
 
 576 N.W.2d 545
 
 (quoting
 
 Wis. Stat. § 111.34
 
 (2)(a) ). The majority, however, errs in the other direction. Its restriction on the use of the inference method gives an employer carte blanche to fire an employee because of a symptom of a disability, as long as the employer does not overtly state that the disability is the reason for the dismissal.
 

 ¶68
 
 Gambini
 
 forewarned: "[I]f the law fails to protect the manifestations of [a] disability, there is no real protection in the law because it would protect the disabled in name only."
 
 486 F.3d at 1095
 
 . Similarly, over four decades ago, the United States Supreme Court cautioned that disability discrimination laws are necessary not only to protect against prejudice, but to combat "the fact that the American people are simply unfamiliar with and insensitive to the difficulties confront[ing] people with [disabilities]."
 
 School Bd. of Nassau Cty., Fla. v. Arline
 
 ,
 
 480 U.S. 273
 
 , 279,
 
 107 S.Ct. 1123
 
 ,
 
 94 L.Ed.2d 307
 
 (1987) (citation omitted).
 

 ¶69 The Wisconsin Fair Employment Act is to be "broadly interpreted to resolve the problem it was designed to address."
 
 Crystal Lake Cheese Factory v. LIRC
 
 ,
 
 2003 WI 106
 
 , ¶ 46,
 
 264 Wis. 2d 200
 
 ,
 
 664 N.W.2d 651
 
 (quoting
 
 McMullen v. LIRC
 
 ,
 
 148 Wis. 2d 270
 
 , 275,
 
 434 N.W.2d 830
 
 (Ct. App. 1988) ). The purpose of the law is "to encourage and foster to the fullest extent practicable the employment of all properly qualified individuals regardless of any [disabilities]."
 
 McMullen
 
 ,
 
 148 Wis. 2d at 275
 
 ,
 
 434 N.W.2d 830
 
 . The majority's restrictive interpretation undermines this purpose and provides no protections at all to employees with disabilities.
 

 III
 

 ¶70 Further, the majority's approach is unworkable. By decoupling the disability from its symptoms and requiring an employer's knowledge of a disability
 
 prior
 
 to the adverse action, the majority places an impossible burden on an employee with a disability. This burden falls particularly heavily on those with mental health conditions that are not always immediately apparent to a layperson or employer.
 

 ¶71 The majority states that "[e]xcusing the employee from proving the employer's knowledge of the causal connection allows LIRC to find intentional discrimination where there is no proof of it." Majority op., ¶ 40. Yet it concedes that "[t]he consequences of bipolarism are not matters of common knowledge."
 
 Id.
 
 , ¶46. It then concludes that "[b]ecause of the amorphous nature of this disability, an employee's bare assertion of causality cannot be credited as authoritative."
 
 Id.
 
 Thus, the majority examines what Wisconsin Bell knew at
 the time it terminated Carlson's employment.
 
 Id.
 
 , ¶47.
 

 ¶72 So what did Wisconsin Bell know at the time it terminated Carlson's employment? As the majority details, Wisconsin Bell knew a full year before the incident that led to his dismissal that Carlson had bipolar disorder that could manifest in significant depression.
 
 Id.
 
 , ¶ 11. It knew that bipolar disorder may include "[e]xtremes of moods" that "can occur rather quickly and [are] often triggered by relatively minor frustrations."
 
 Id.
 
 It knew that Carlson was receiving psychotherapy.
 
 Id.
 

 ¶73 Yet despite the fact that these letters precisely describe the actions that ultimately led to Carlson's termination, the majority discounts the letters because they do not mention any "causal nexus" between bipolar disorder and Carlson's conduct.
 
 See
 

 id.
 
 , ¶¶46-47. With Wisconsin Bell's knowledge of Carlson's condition and its manifestations, one wonders what kind of nexus would satisfy the majority.
 

 ¶74 The majority's requirement that the employer have knowledge of the disability prior to the adverse action encourages rash and uninformed decision-making on the part of employers. Under the majority's approach, an employee must provide immediate medical proof that an action was caused by a disability or face termination. This is a nearly impossible hurdle.
 

 ¶75 What are Carlson and others similarly situated to do? Should they notify their employers of their mental health conditions and all of their possible manifestations immediately upon being hired in order to protect their employment if symptoms manifest themselves at a later date? But it is often impossible to predict in advance all of the ways that a disability may manifest itself in a workplace. Symptoms as well as work environments may change and disabilities may progress and regress. This burden falls particularly severely on those with mental health disabilities, which are less apparent to the layperson.
 

 ¶76 If employees do not present a sufficient medical report prior to an adverse action, how are they going to meet the majority's apparent requirement that medical proof be immediately available in order to thwart termination? Such a requirement seems divorced from the reality of medical treatment and workplace relations.
 

 ¶77 Often a medical professional will want to have an appointment with the employee to discuss what happened before issuing a report on causation. Scheduling medical appointments and receiving subsequent reports opining on causation will likely take weeks, if not longer, to accomplish.
 

 ¶78 Further, the specter of providing a disclosure of all possible manifestations, even if they may never happen, puts an employee in a very difficult position. It forces an employee to disclose a mental health disability and its potential manifestations just in case. Aside from being an unnecessary invasion of privacy and potentially embarrassing, it also may discourage people with disabilities from applying for employment in the first place. Far from advancing the purpose of the WFEA, the majority's unworkable approach runs completely counter to its objectives.
 

 ¶79 On the other hand, application of the inference method of determining discriminatory intent avoids placing an undue burden on people with disabilities. Further, it gives meaning to the protections of the Wisconsin Fair Employment Act and avoids rendering those protections merely illusory.
 

 ¶80 For the foregoing reasons, I respectfully dissent.
 

 ¶81 I am authorized to state that Justice SHIRLEY S. ABRAHAMSON joins this dissent.
 

 As the majority opinion explains, Technical Service Representatives generally receive calls based on their availability. Majority op., ¶ 8. They can, however, control receipt of calls by making themselves unavailable by entering certain call-blocking codes, such as for meal and rest breaks, short health breaks, and training and staff meetings.
 
 Id.
 
 Improper use of call blocking codes to avoid taking calls could result in immediate termination.
 
 Id.
 

 "Q-chat" is an internal instant messaging program used by Wisconsin Bell.
 

 Wis. Stat. § 111.322
 
 (1) provides in relevant part: "[I]t is an act of employment discrimination to ... terminate from employment ... any individual ... because of any basis enumerated in s. 111.321." Among the bases enumerated in § 111.321 is "disability."
 

 LIRC's finding of fact number 24 aptly describes this causal link:
 

 Carlson's mood and his inability to work on April 20, 2011 upon learning that he failed the collections test were caused by his bipolar disorder. The Q-chats he engaged in were reflective of his mood disorder, and were consistent with his psychotherapist's recommendation that he reach out to others for support as a means of coping with his mood. The fact that he used slang, including some humor, and checked on the consequences of his taking a medical leave, were not inconsistent with the conclusion that his mood and inability to work were a manifestation of his mental illness. He was unable to work because of symptoms of his mental illness, and appropriately used the health code and sick leave just as it was available to any sick employee.